Argued March 6, accused reprimanded September 12,
petition for rehearing denied October 17, 1978

In re Complaint as to the Conduct of
ROLAND F. BANKS, *Accused.*
(No. 1200)

In re Complaint as to the Conduct of
DOUGLAS M. THOMPSON, *Accused.*
(No. 1201)

(SC No. 25221)

584 P2d 284

Richard F. Deich, Portland, argued the cause for Oregon State Bar. With him on the brief were Grover C. Dahn and Robert L. Dressler, Portland.

W. V. Deatherage, Medford, argued the cause for the accuseds. With him on the brief were Frohnmayer & Deatherage and Karen C. Allan, Medford.

Before Holman, Presiding Justice, and Howell, Bryson, Lent, and Linde, Justices.

PER CURIAM.

## PER CURIAM.

This is a combined disciplinary proceeding brought by the Oregon State Bar against two of its members. The accuseds are partners in a large firm, the accused Thompson being in the firm's business department, and the accused Banks being in its litigation department. The charges against both arise out of legal business transacted for United Medical Laboratories, a corporation (UML), its board of directors, its officers, the members of the family who owned the corporate stock, and a corporation competing with UML. As would be anticipated, the facts are complicated.

UML was engaged in operating a medical testing laboratory, a large amount of whose business was done by mail. Its creator, organizer, founder, chief executive, and driving force was R. S. Michel. The stock was originally owned solely by Michel and his wife, but, through subsequent estate planning, successive gifts of stock were made to two daughters, resulting ultimately in 29 shares each being owned by Michel and his wife and 21 shares each being owned by the daughters. However, Michel was a completely dominating force and ran the business as his private fief.

The business was tremendously successful. From its start in the basement of a private home, it grew to employ in excess of 1,500 people and to become the largest user of the mails in Oregon and one of the larger users of the telephone. The accuseds' firm began its representation of the Michels and their business in 1965. Most of the transactions out of which the present charges arise occurred in 1972. At that time the legal business of both the corporation and the Michel family was one of the substantially lucrative accounts possessed by the firm of which the accuseds are members. Thompson did estate planning, will drawing and other private business for Mr. and Mrs. Michel, as well as representing the corporation in its business transactions; Banks handled UML's litigation. Because of the identity of interests, corporate and private, all legal

services were billed to the corporation regardless of whether the work performed was corporate or private.

The board of directors of UML was composed of Mr. and Mrs. Michel and their two daughters. Michel was president and Mrs. Michel held various offices in the corporation. There is no record of any dividends ever having been paid. Michel had a 10-year employment contract with the corporation whereby he received a percentage of the *gross income* of the corporation. There is no evidence of any income to anyone else except for the possibility of a salary to Mrs. Michel. Michel was thus in a position to assure himself of substantially all immediate benefits from the operation of the corporation. The employment agreement between Michel and the corporation was entered into in 1967 and was drawn by Thompson. By 1972 both daughters were grown and married. One lived in Seattle, where her husband was a professor at the University of Washington, and the other lived in Portland, where her husband was employed by UML.

UML's equipment was owned by a separate corporation, UML Leasing (Leasing), which leased it to UML. Leasing was owned by the Michel family and was controlled by Michel in the same manner as was UML. The real property used by UML was owned by a UML employee profit sharing trust which leased it to UML. Thompson was a trustee of the profit sharing trust, as was Michel.

UML had non-competition contracts with its salesmen and with most of its administrative personnel. The contracts were not originally drawn by the accuseds' firm. However, Banks engaged in considerable litigation for the corporation in the enforcement of these contracts and from time to time would suggest changes in the form of the contracts as his experience in their enforcement dictated.

Because of the rapid growth of the corporation, some unsuccessful ventures, and difficulty in operating an expensive computer effectively, the corporation

became short of operating funds. By 1972 it was in debt to a bank for approximately $3,000,000 and was dependent upon the continued advancement of operating funds from the bank. In addition, it had many past-due bills. The bank was becoming progressively more demanding about a refinancing of the corporation or its sale so it could be reimbursed for the money it had advanced.

In an effort to relieve the pressure and to break the logjam caused by the computer, Michel directed the computer technicians to remove certain limits or safeguards from the computer which had been set by the medical directors employed by the corporation. As a result, 60,000 test results were spewed out, the accuracy of which was doubted by the medical directors. As a consequence of this action, high level employees became concerned about the moral aspect of the accuracy of the published test results as well as their personal responsibility therefor and were threatening to go to the federal agencies which licensed and regulated medical testing laboratories. Mrs. Michel's and her daughters' concerns about the removal of the computer safeguards and about the solvency of the company and its ability to meet its debts caused, for the first time, a confrontation between Michel and the members of his family. For the first time his absolute control was questioned. As a result, Michel made the tactical mistake of physically assaulting his wife.

On the morning of July 4, 1972, after having been assaulted by her husband, Mrs. Michel promised to assign her stock to him. As a result, Michel called Thompson to his home early in the morning to have him arrange the stock transfer. Before Thompson arrived Mrs. Michel had slipped away from her husband and had gone to the home of the daughter who lived in Portland. Also present there were the other daughter, who had come down from Seattle, and an attorney from New York City, who had been called for consultation by the daughter from Seattle. Michel, having missed his wife, went to the daughter's home

[ 463 ]

and, in the ensuing imbroglio, made a physical assault upon the Seattle daughter. Michel then returned to his home and directed Thompson, who in the meantime had arrived, to go to the daughter's home to see what was going on. Thompson went to the daughter's home and spent considerable time with the New York lawyer and the other members of the Michel family talking over the difficulty which was presented. The creation of a voting trust for the corporate stock was discussed, but there was no indication at that time that such a trust, if created, would not include all the stock of the corporation.

Subsequently, on July 6, at a stockholders' meeting, the New York attorney presented the right to vote the stock of both Mrs. Michel and the two daughters pursuant to an irrevocable voting trust which they had created, and a new board of directors was elected which retained Michel as a member of the board but substituted new directors in place of the other members of the family. This was an attempt by the other members of the family to curb Michel and at the same time to isolate themselves from constant confrontation with him, since they did not feel they could emotionally withstand such confrontation. Mrs. Michel went into hiding. The new board permitted Michel to remain as president and executive officer but attempted to institute stringent controls on his authority. A voting trust without the inclusion of Michel's stock came as a surprise to both Michel and Thompson.

This status existed about a month, with Michel and the board at odds and with the situation gradually deteriorating. Thompson continued to advise Michel as the executive head of the organization, and he also advised other members of the board regarding their problems, which Michel took as a display of disloyalty to him. On August 2, the board put Michel on a leave of absence. Thompson then told Michel he could no longer advise him and that he would have to secure other counsel for this purpose.

The bank requested, as a condition of continuing to advance operating money, that Leasing subordinate its claims against UML for rent on equipment to the indebtedness of the bank. Michel still controlled Leasing, as it had not been made subject to the voting trust created by the other members of the family; he refused to so subordinate the debt. Pursuant to a request of the board, Banks rendered an opinion to it that Michel's failure to cooperate in subordinating Leasing's claim for rent constituted a violation of Michel's employment contract with UML. Ultimately, Michel did subordinate Leasing's claims to the bank's loans.

After Michel was relieved as executive officer, he made up with his wife who, as a result, had a change of heart and decided she had made a mistake in establishing the voting trust. Though the accuseds claim otherwise, the plain inference is that under Michel's guidance she sought separate legal counsel and commenced litigation challenging both the legality of the voting trust and the election of the new board of directors. This put her in conflict with her daughters, who had joined with her in the formation of the voting trust. The defendants in the litigation were the daughters, the trustees of the voting trust and the new board of directors for UML. UML was not a defendant. At the request of the board, the accuseds' firm, in the person of Banks, undertook the defense of the suits. Michel expressed outrage that Banks would do this. Upon being told by Mrs. Michel's attorney of Michel's objections, Banks withdrew and had an associate attorney of the firm handle the defense thereafter.

Although extensive depositions, including a deposition of Mrs. Michel, were taken by the accuseds' firm, the cases were never tried because the bank put on additional pressure for liquidation of its indebtedness and it was decided by all concerned to sell the corporation, if possible. As a result, all agreed that Michel should be designated to attempt to sell the business. He was successful in selling it for $10,000,000. When it was sold, the board of directors

resigned and Michel was retained by the purchasers to run the business. He immediately fired all administrative personnel and officials of the corporation who, in his opinion, had been disloyal to him. He also terminated the accuseds' firm as attorneys for the corporation.

About a dozen of the discharged personnel of UML decided they would put their expertise to work and form a business in competition with UML. Thus was born Lancet Medical Industries (Lancet). The accuseds' firm was engaged as legal counsel for Lancet. Thompson became a director during its formation and both he and Banks became stockholders and investors in the company. Banks was asked by the founders of the new business for a legal opinion as to the enforceability of non-competition contracts. This was thought to be important by the founders of Lancet because they would necessarily be engaging salesmen throughout the country who might have previously worked for competing businesses. The founders of Lancet put out a prospectus for the purpose of raising funds to finance the new business and Banks' memorandum in response to the founders' request was included therein.[1] Thompson helped edit the prospectus. The memorandum read as follows:

"You have asked us to give you an opinion concerning those states where covenants not to compete in employment contracts are not enforceable. There are seven states which have statutes which have been construed to make such agreements unenforceable. These are:

1. Alabama
2. California
3. Louisiana
4. Michigan
5. North Dakota
6. Oklahoma
7. South Dakota

---

[1] Banks was approached by the discharged administrative personnel for an opinion as to the enforceability of the non-competition provisions of *their* contracts of employment with UML and was asked to represent them in any litigation concerning the contracts. Banks, however, declined to so represent them and told them to seek counsel elsewhere.

"There are other states that have refused to enforce these agreements if the agreement attempts to restrain the employment in an area which is unreasonably large. I believe that most of the contracts affecting UML salesmen attempt to restrict his competition in any state where UML does business. This would be an unreasonably large area and in the following states such contracts have been held unenforceable:

1. Georgia
2. Illinois
3. Indiana
4. Iowa
5. Maine
6. Ohio
7. Wyoming

"This type of contract would probably also be unenforceable in New Hampshire, New Jersey, Rhode Island and Delaware. Those states will enforce these such [sic] provisions if they can find that the language is such that the contract would be divisible but the language in the UML contract is not divisible and I do not believe under the present case law that those four states would enforce the contract either.

"The rest of the states would probably enforce UML salesmen employee contracts but they would restrict the enforcement to the area in which the salesman worked while he was in the employ of UML.

"For your file I enclose herewith a copy of a memorandum of research our office did in this regard which does contain the authoritative citations for the opinions I have given in this letter."

After UML terminated Thompson's services as its attorney and after he invested in and undertook to represent Lancet, Thompson remained as a trustee of the profit sharing trust for several years. During that time the trust had under lease to UML the real property upon which it operated its business, and questions arose concerning the enforcement of a provision for an increase in rental of that property. There is no evidence that Thompson took advantage of his position as trustee to the detriment of UML.

[ 467 ]

We point out, prior to delineating the specific charges against the accuseds, that they were absolved of all unethical conduct by a determination of the trial board, which determination was concurred in by the Disciplinary Review Board. However, the Disciplinary Review Board expressed some uneasiness, as indicated by a part of their statement:

"The Review Board, however, is of the opinion that a gray area exists with respect to who [sic], as successive clients, an attorney can properly represent when a business split-up or division occurs. The attorney may have given representation to a group or organization that later becomes two or more groups or organizations. There may exist an appearance of impropriety, less than a direct conflict of interest, that mitigates [sic] against the attorney terminating representation for one client, only to shortly or immediately thereafter emerge as attorney for a new client, split off in some way from the first client.

"The Board of Review respectfully recommends this area for consideration and elucidation by the Legal Ethics Committee of the Oregon State Bar or other appropriate committee."

All of the charges made against both accuseds are in the nature of claims of conflict of interest. The first charge made against both accuseds questions whether, after having drawn Michel's contract of employment for the parties, they could with propriety advise UML that Michel's conduct in refusing to subordinate UML's debt to Leasing to the indebtedness of the bank was a breach of his employment contract with UML. Thompson drew the contract and Banks gave the advice. It is the accuseds' position that the firm represented the corporation—not Michel, that the contract was drawn for UML in the course of the firm's representation of UML, that UML paid for the firm's work in drawing the contract, that the firm's sole duty was to UML, and that, pursuant to such duty, it was obligated to advise the corporation in accordance with its request concerning the contract's possible breach by Michel.

[ 468 ]

The general rule relative to a corporate attorney's conduct is in accordance with the accuseds' contention. The corporation usually is considered an entity and the attorney's duty of loyalty is to the corporation and not to its officers, directors or any particular group of stockholders. *Meehan v. Hopps,* 144 Cal App 2d 284, 293, 301 P2d 10, 15 (1956); *U. S. Industries, Inc. v. Goldman,* 421 F Supp 7 (SD NY 1976); *Jacuzzi v. Jacuzzi Bros., Inc.,* 218 Cal App 2d 24, 32 Cal Rptr 188 (1963).

The case which best presents the accuseds' position is *Meehan v. Hopps, supra,* in which the corporate attorneys represented the corporate receiver in an action against the former executive officer of the corporation who had had a large amount of individual control over the corporation. A recovery was sought because of the alleged commission of certain improprieties benefiting the defendant while he was a corporate officer. At the time the defendant first became associated with the corporation, the corporate attorneys drew his contract of employment as president of the corporation. In holding that there was no conflict of interest by the attorneys resulting from the representation of the receiver against the former corporate officer, the court said:

> "Appellant has not cited, nor have we found, any case holding that an attorney for a corporation is disqualified from representing it in an action brought by it against one of its officers, nor that in such an action the attorney may not use information received from such officer in connection with company matters. The attorney for a corporation represents it, its stockholders and its officers in their representative capacity. He in nowise represents the officers personally. It would be a sorry state of affairs if when a controversy arises between an attorney's corporate client and one of its officers he could not use on behalf of his client information which that officer was required by reason of his position with the corporation to give to the attorney.
>
> "* * * * *.
>
> "Assuming that some of the information obtained from Hopps by counsel as representative of the corpora-

tion is that upon which the receiver's contention that Hopps dominated the corporation, its officers and companies, to its damage, is partially based, nevertheless such fact would not prevent counsel from representing either the corporation or the receiver in a controversy with Hopps nor from using that information against him. To hold that it would do so, would, in effect, grant an immunity to Hopps to which he was not entitled. The fact that in the several matters in which counsel represented the corporation what appeared to be for the benefit of the corporation also was for Hopps' benefit as a principal stockholder and because of his interest in the allied companies, did not make counsel his personal attorneys. If this were true, then the attorney representing a corporation in any given matter becomes the personal attorney of each stockholder because the attorney's actions benefiting the corporation likewise benefit the stockholder. Such relationship would disqualify the attorney from acting adversely to the stockholder concerning that particular matter in any controversy between the stockholder and a third party, but obviously would not prevent the attorney from representing the corporation in any controversy between it and the stockholder. As attorneys for the corporation, counsel's first duty is to it. Likewise, as an officer of the corporation, it was Hopps' duty to disclose to it all information necessary for its purposes. To hold that the giving of such information in that more or less intimate relationship which necessarily must exist between an officer of the corporation and its attorneys would prevent the corporation attorneys from thereafter using it in favor of the corporation in litigation against the officer, would be unfair to the corporation and its stockholders, and would violate the above mentioned very important precept, namely, that the attorney's first duty is to his client. * * *." 301 P2d at 14-16.

The facts in *Meehan,* however, are materially different than they are here, because in *Meehan* the court found as a fact that the corporate attorney never represented the corporate officer in his personal capacity. Also, the contract of employment as president was drawn at the direction of the then chairman of the board of the corporation. In addition, *Meehan* was not

a case involving a family corporation. In the absence of personal representation of the corporate officer, there could be no conflict of interest on the part of the attorneys because, as representatives of the corporation, they were entitled to receive all information from the corporate officer concerning his conduct of corporate business.

No one has cited any authority, nor have we been able to find any, on the question of whether this general rule should be applicable to a closely held family corporation which is substantially controlled and operated by one person and where the corporation's attorneys have been that person's personal attorneys as well. For example, suppose Michel had owned 100 per cent of the stock and subsequently sold all of it to another and continued to operate the corporation under his contract. In such a situation, if a dispute concerning his possible breach of his employment contract erupted, would the accuseds ethically be able to represent the corporation in that dispute? Would there not be an inherent conflict of interest because of the original identity of the corporate and private interests? Under the hypothetical facts just stated, the corporate interests and the individual interests would subsequently become disparate. At the time the contract was drawn, the individual interests would really dictate what was done because the corporate firm would be only a method of doing business chosen by the individual for the purpose of promoting his private interests. In such a situation, as in many other fields, common sense dictates that the corporate entity should be ignored.[2]

■ Moving from the hypothetical situation to the present one, are there material differences in the present situation which dictate a different result? There are differences in degree, but we consider them

[2]See *Seifert v. Dumatic Industries Incorporated,* 413 Pa 395, 197 A2d 454 (1964), for a case in which the court looked through the corporate form for the purpose of identifying the real interests to enable it to decide whether conflicting interests existed.

insufficient to change the result. At the time of the drawing of the contract Michel *was* the corporation. As he expressed himself when, at the beginning of the difficulty, he was asked to resign by an employee, "I told him * * * that I had made the company and that I could destroy the company." The stock had been distributed among the members of the family, but, for practical purposes, it was his corporation. He was in absolute control and substantially all the immediate benefits of the business could be made to flow to him through his contract for compensation. Nor can we differentiate between Michel and his wife. He was the completely dominant marital partner at the time the contract was drawn. Until the events which precipitated the confrontation, the participation of the other members of the family in corporate activities was whatever Michel wanted it to be. It is small wonder that as a layman Michel was completely outraged when he found that the attorneys he thought he had hired to protect his interests, both personal and corporate, which interests were substantially identical, were opposing him in a dispute calling into question the application of the legal work he had hired them to do.

Subsequent to the sale of the corporation, Michel and his wife sued the purchaser. Called into question were the records of UML during the time the accuseds' firm represented UML. Thompson's deposition was taken by the litigants one year and nine months prior to the filing of the Bar's complaint against him. During the deposition, the purchaser, as the successor of UML, was asserting the confidentiality of the accuseds' records resulting from the business done for UML. The Michels were asserting the confidentiality of the records resulting from the business done for them as individuals. In order to assert their claimed privileges as to separate files, Thompson was questioned by the litigants concerning whom he was representing in performing various services. The following occurred:

"Q All right. First of all, could you pull out the file that contains Mr. Michel's or Mr. and Mrs. Michel's wills?

"A Yes, I think I saw them here. Well, do you want me to pull out what might be considered personal?

"Q Yes.

"A Here is one on Mr. Michel's employment contract, which I guess I was representing both sides, maybe. I don't know."

Subsequently, when again questioned about the matter, he responded:

"Q With respect to—I think it's file No. 23, the employment contract that has been described by you as possibly falling into the category pertaining to Mr. Michel personally. Was United Medical Laboratories the other party to that agreement?

"A Yes.

"Q Who represented United Medical Laboratories in the negotiations which gave rise to the employment contract you have reference to?

"A Well, there's one employment contract in there, at least one, that was drawn, as I recall, before our office represented UML, and I assume that Mr. Gronnert drew that. That goes way back to the beginning of the company in '61 or '62 or something like that. The others were drawn when we were representing the company, and at that time I certainly felt that I was drawing it on behalf of the company, and, oh, I suppose it's like a lot of employment contracts. You draw—you know, when you've got a friendly client, he doesn't hire outside counsel. He knows how much money he wants and that's it, you know."

The relationship at the time the contract was drawn was inherently ambiguous, as demonstrated by Thompson's uncertainty as to whether, in that transaction, he had represented the corporation or "both sides." Because of that inherent ambiguity, the firm should not thereafter have taken sides when the contract came into question.

The accuseds urge upon us Ethical Consideration 5-18 of the American Bar Association Code of Professional Responsibility, which is, as follows:

> "A lawyer employed or retained by a corporation or similar entity owes his allegiance to the entity and not to a stockholder, director, officer, employee, representative, or other person connected with the entity. In advising the entity, a lawyer should keep paramount its interests and his professional judgment should not be influenced by the personal desires of any person or organization. Occasionally a lawyer for an entity is requested by a stockholder, director, officer, employee, representative, or other person connected with the entity to represent him in an individual capacity; in such case the lawyer may serve the individual only if the lawyer is convinced that differing interests are not present."

This ethical consideration is part of the rationale behind the entity theory which we have previously set forth and to which we believe the present situation is a logical exception. The ethical consideration implies that if a corporate officer is represented by a corporate attorney at a time when no conflict exists, as we believe was the fact in the present case, and then a conflict arises between the officer and the corporation about the subject of the representation, the attorney is in an untenable position if he represents either one.

The accuseds also point to the necessity that the interests of the corporation be protected by a continuity of legal service by someone who is familiar with the particular problems of the corporation at a time of extreme corporate stress as exhibited by the facts in this case. In weighing the interests of the corporation and the desirability of avoiding conflicts of interest, it seems to us that the balance should be struck the other way in closely held family corporations where the operator of the corporation either owns or controls the stock in such a manner that it is reasonable to assume that *there is no real reason for him to differentiate in his mind between his own and corporate interests.* In such a situation all the reasons are in existence which give rise to the rule against conflicts of interest

because there is no basis for the individual to believe that the attorney has or ever will have other than his individual interest at heart.[3] It is our conclusion that the only ethical position for an attorney to adopt when substantially identical interests which he has represented become divergent is to represent neither the individual nor the corporation.

> "When the interests of clients diverge and become antagonistic, their lawyer must be absolutely impartial between them, which, unless they both or all desire him to represent them both or all, usually means that he may represent none of them.
>
> "* * * * *.
>
> "* * * Where two individuals for whom he drew a contract or a mortgage get into a dispute over it, he may not represent either." Drinker, Legal Ethics 112-13 (1953).

We realize that whether, at the time of the original representation, the interests of the individual and the corporation were sufficiently identical to justify ignoring the corporate entity is a question of degree, and there will be many cases close to that non-exact line between the permissible and the impermissible. However, this is a common problem and is not singular to ethical considerations involving conflicts of interest.

In each instance the Bar has alleged the possession by the accuseds of confidential information secured by their firm in its representation of Michel's interests. However, the possession and disclosure of confidential information by attorneys in their representation of another party is unnecessary to the existence of a conflict of interest. Although the disclosure of such confidences is one of the probable consequences of

---

[3] *See E. F. Hutton & Company v. Brown,* 305 F Supp 371, 389 (SD Tex 1969), in which the court said:

> "In asking the Court to consider all the circumstances when determining whether Brown believed counsel to be his attorneys, Hutton has proposed a proper inquiry. Brown's reasonable understanding of his relation with the attorneys is the controlling factor here. * * *."

See also Drinker, Legal Ethics 134-35 (1953).

representing adverse interests, such disclosures are unnecessary to a charge of conflict of interest. Drinker, Legal Ethics 104 (1953).

" 'The test of inconsistency is not whether the attorney has ever appeared for the party against whom he now proposes to appear, but it is whether his accepting the new retainer will require him, in forwarding the interests of his new client, to do anything which will injuriously affect his former client in any matter in which he formerly represented him, *and also* whether he will be called upon, in his new relation, to use against his former client any knowledge or information acquired through their former connection.' " Drinker, Legal Ethics 105 (1953) quoting Morrow, J., in Re Boone, 83 F 944, 952-53 (1897). (Emphasis added.)

"* * * If there is the slightest doubt as to whether or not the acceptance of professional employment will involve a conflict of interest between two clients or with a former client, or a conflict between the interests of any client and that of the attorney, *or* may require the use of information obtained through the service of another client, the employment should be refused." Wise, Legal Ethics 273 (2d ed 1970). (Emphasis added.)

"* * * In another case, the same Committee [New York City Bar] said that a lawyer who had negotiated an employment contract on behalf of a client with a corporation might not, after his client had got other counsel, bring a suit on behalf of the corporation to impair the value of the contract which he had drawn. The Committee held that this was so 'because it might involve the use by you of information confidentially obtained during your employment by your former client.' While this was, of course, a sufficient reason for the decision, a broader ground was that the lawyer might not, without consent, represent the other party to a contract which he had drawn for a former client. * * *." Drinker, Legal Ethics 109 (1953).

The Oregon Code of Professional Responsibility does not directly dispose of the issue. However, no code of ethics can establish unalterable rules governing all possible eventualities. Therefore, the ultimate resolution of problems like the present rests in the reasoned

[ 476 ]

discretion of the court. *Cannon v. U.S. Acoustics Corporation,* 398 F Supp 209 (ND Ill 1975).[4] The disciplinary rule which comes the closest is DR 5-105, which provides:

"Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C).

"(C) In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

"(D) If a lawyer is required to decline employment or to withdraw from employment under DR 5-105, no partner or associate of his or his firm may accept or continue such employment."

Subsequent to the adoption of the Oregon Disciplinary Rules, the American Bar Association amended in 1974 its Disciplinary Rule 5-105(A) and (B), which prior thereto read the same as Oregon's, by adding to each subsection, prior to the word "except," the words "or if it would be likely to involve him in representing differing interests." As Drinker has indicated, however, even before the amendment, the disciplinary rule was construed to prevent anything from being done which would tend to affect a former client injuriously

---

[4] Although the factual situation in the cited case is different from the present situation, anyone with a serious conflict of interest problem should read the opinion.

in any matter in which the former client had been represented.

We believe the only realistic view that can be taken is that the accuseds' firm represented both Michel and the corporation at the time the contract was drawn and that it could not subsequently, when the interests of its clients were in opposition, represent either one in a dispute over the application of the contract without the consent of both.

■ The next two charges, although not identical, will be treated together. The first one, against Thompson, charges him with unethical conduct in continuing to represent the corporation and its new board of directors after Michel lost control and at a time when Michel's interests and the board's interests were opposed. The second charge, against Banks, alleges unethical conduct in representing the daughters, the new board of directors and the voting trust in the law suits brought against them by Mrs. Michel. Contrary to the accuseds' contention, the evidence plainly indicates that Mrs. Michel was bringing the suits at the request of Michel and in his interests as opposed to those of the board. Most of what has been said in disposing of the previously discussed charge is applicable here. The firm's relations with Michel and his prior identity of interest with the corporation made involvement on behalf of the daughters, the new board and the voting trust improper. We believe this to be so despite the request by the board, which was the governing body of the corporation, that Banks represent the defendants in the suits. By such a holding we do not intend to include the usual situation where, in the beginning of the representation, the corporate and individual interests are not, for practical purposes, substantially identical.

Michel testified that after the new board took over early in July and before the board relieved him of his duties as executive officer early in August, he and Thompson would have conferences concerning how

best "to forestall a complete take-over by this group * * *." This is verified by Thompson's responses, found in the same deposition from which we have quoted, when asked to differentiate between personal representation of Michel and representation of the corporation in relation to the firm's files which reflected its activity during the summer of 1972:

"Q  Okay. With the exception of the wills, then, these two files that you have, which would be, as I understand, basically the files which relate to Mr. Michel personally?

"A   You got to understand that especially toward the end, shall we call it, the end of our representation in October of '72, we had a lot of problems relating to the voting trust, et cetera, and Mr. Michel, of course, in his status as a shareholder was looking to me for representation, and to some extent, even though I billed the company for it, that might be placed in somewhat the same category as some of these other areas you're talking about. So I do have other files relating to the voting trust or the problems created by the voting trust which Mrs. Michel established in the summer of '72.

"* * * * *.

"MR. JANSSEN: At this point, though, it would seem to me that whether or not you raise an objection, that we have to take care of the matter of the availability of these respective records to the parties, and this is what I suggest: that Mr. Thompson, since he is the only one that can do it and protect the respective privileges, segregate from these files those matters relating to Mr. and Mrs. Michel personnally, as we have already described them.

"MR. PETERSON: I think he's got that already done right here.

"THE WITNESS: Well, the one question—

"MR. PETERSON: Or the bulk of it anyway.

"THE WITNESS: It's easy for me to do that relating to the fertilizer plant and Standard Products, if any, and the estate planning and wills. The area that is going to be difficult for me as that you should furnish me with some guidelines, if it is important to you, on the work that I did relating to the voting trust established by Mrs. Michel, in which my representation might be deemed to

be representation of Mr. Michel as a shareholder and individual. I have a significant amount of material relating to the turbulent events of the summer of '72 which might technically be deemed to be individual matters, because they were an effort to guard Mr. Michel's position as a shareholder.

"* * * * *.

"Q Defendants' Exhibit 24 is a manila folder captioned 'United Medical Laboratories, Inc—United Medical Leasing Co.' What does that contain?

"A Well, this is some miscellaneous material that I think I put together after the July 6 insurgency when we were trying to use the leverage of the leasing company to—Mr. Michel was trying to use the leasing company leverage to gain control back of the laboratory. It just contains some various papers, leases, bylaws, articles. It's just a composite, I think, mainly of materials from other files relating to this subject."

In fairness to Thompson, it must be remembered that he was, while testifying, in a position in which he did not wish to be accused of disclosing any information which could possibly be claimed to be subject to the attorney-client privilege; nevertheless, his reasonable indecision as to whom he was representing at the time demonstrates that the firm's relationship with Michel made its position sufficiently equivocal to indicate that the firm should not have been representing both sides after Michel lost control.

The Bar has made substantially identical charges against both accuseds to the effect that they were involved in a conflict of interest in advising the founders of Lancet concerning the noncompetition provisions UML had with its employees. In this instance it is necessary to quote the specific charge:

"On or about October 30, 1972, the Accused and the firm of which he is a member advised Charles Dexter, and others who had, previous to that date, been employees of UML, and who were, on or about that date, no longer employees of UML, and were considering setting up a business entity to compete with UML. *Said advice included advice concerning the enforceability of*

[ 480 ]

*the non-competition provisions in the employment agreement between Dexter and UML."* (Emphasis ours.)

■ We know of no ethical reason why, upon the termination of its representation of UML, the accuseds' firm should be prevented from representing others in the same business or why the firm should not be allowed to give general advice to such a competing business on non-competition agreements so long as confidential information is not disclosed nor advice given concerning the enforceability of UML contractual provisions which it was engaged in perfecting and enforcing for UML. Therefore, the part of the charge concerning advising a competitor of UML generally is insufficient.

■ It is apparent from the letter of advice, which is the principal basis for this charge, and which has been previously quoted in full, that it is insufficient to substantiate the specific claim that the accuseds gave advice concerning the non-competition provisions of Dexter's contract with UML. Dexter was one of the leading lights in the formation of Lancet and had previously taken Michel's position as executive officer of UML. The communication is not capable of the interpretation that it is advising Dexter or any of the founders concerning *their* non-competition agreement with UML. The accuseds gave no such advice in the letter in question and the evidence is undisputed that they declined to advise any of the founders of Lancet on their contracts with UML or to take any part in that litigation.

The letter of advice does plainly advise the founders of Lancet on the enforceability of UML contractual provisions with salesmen. However, the specific charge against the accuseds is not subject to being stretched any further than the giving of advice on Dexter's contract with UML. In view of the advice communicated in the letter, it is not clear to us why the Bar so limited the specific charge. The accuseds are not guilty of the *charge specified.*

[ 481 ]

■ The last charge, which is against Thompson, claims he demonstrated unethical conduct by remaining as a trustee of the UML profit sharing trust while he actively promoted and functioned as attorney for Lancet. The profit sharing trust owned and leased to UML the real property upon which UML did business, and there were provisions of the lease concerning escalation of rental, the enforceability of which was in question. By so remaining as trustee while promoting and representing Lancet in competition with UML, Thompson was in a position whereby he could have hurt UML, his former client. No one claims he did. As a matter of fact, he was urged by persons representing UML not to resign. However, although we do not take a serious view of this charge, Thompson should have resigned for the sake of appearance.[5] There was no reason shown for his continuing as a trustee other than the inconvenience in replacing him, and this reason is inadequate. The likelihood of public suspicion being aroused outweighed the interests which were served by his continued participation as a trustee.

■ It is the court's conclusion that the accuseds are guilty of the charges as above indicated and that, because of the novel aspects which have caused us to plow some new ground, only a public reprimand is required. This opinion will stand as that reprimand.

---

[5] Canon 9, Code of Professional Responsibility (adopted by the Supreme Court of Oregon, December 20, 1970), "A lawyer should avoid even the appearance of professional impropriety."