**In re BERGER McGILL, INC., Debtor.**

**Berger McGill, Inc., Plaintiff,**

**v.**

**Louis R. Capozzoli, and Spouse**

**and**

**North Side Bank & Trust, Defendants.**

Bankruptcy No. 97–15404.
Adversary No. 98–1275.

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

Nov. 18, 1999.

**MEMORANDUM DENYING APPLI-CATION OF TRUSTEE TO EM-PLOY COUNSEL**

JEFFERY P. HOPKINS, Bankruptcy Judge.

This matter is before the Court on the Application of Trustee to Employ Counsel ("Application") (Doc. 20) filed on June 16, 1999, by the Chapter 7 Trustee, Elliott Polaniecki. By his Application, the Trustee seeks the Court's approval of the employment of James C. Frooman and the law firm of Lindhorst & Dreidame ("L & D") as attorneys for the Trustee in this adversary proceeding. The Application is supported by the Affidavit of James C. Frooman ("Frooman Affidavit I"). Defendants Louis R. Capozzoli and his unnamed spouse ("Capozzolis"), on July 16, 1999, filed a Memorandum in Opposition to Application of Trustee to Employ Counsel ("Opposition") (Doc. 22). By their Opposition, the Capozzolis contend that the employment of James C. Frooman and L & D should not be approved by the Court on the basis of a conflict of interest that would allegedly result from such employment. The Opposition is supported by a Proof of Claim of Louis R. Capozzoli.

The Trustee, on July 23, 1999, filed a Memorandum in Support of Application to Employ Counsel ("Trustee's Memorandum") (Doc. 23). Also filed on July 23, 1999, in support of the Trustee's Memorandum was the Affidavit of Thomas E. Martin in Support of Application to Employ Counsel ("Martin Affidavit") (Doc. 24) and the Affidavit of James C. Frooman in Support of Application to Employ Counsel ("Frooman Affidavit II") (Doc. 25). The Capozzolis, on August 25, 1999, filed a Supplemental Memorandum in Opposition to Application of Trustee to Employ Counsel ("Supplemental Memorandum") (Doc. 35). The Supplemental Memorandum is supported by the Affidavit of Louis R. Capozzoli ("Capozzoli Affidavit") and certain documents attached thereto. A hearing on the matter was held on August 25, 1999.

**I**

In 1993, Bill Berger and Ed McGill retained L & D to represent a corporate entity to be formed for the purpose of purchasing the assets of a commercial printing organization. (Martin Affidavit at

¶ 2.) During this time, L & D, primarily through Thomas E. Martin, an attorney practicing with L & D, began representing the corporate entity, later known as Berger McGill, Inc. ("Debtor"), in connection with the purchase of the assets of the printing business. (Frooman Affidavit II at ¶ 2; Martin Affidavit at ¶ 3.) The Debtor is a small, closely-held Ohio corporation. (Capozzoli Affidavit at ¶ 1.) Louis R. Capozzoli was one of the investors in the Debtor. (Martin Affidavit at ¶ 4.) L & D did not represent Capozzoli, who was then represented by Theodore D. Grosser of the law firm of Vorys, Sater, Seymour & Pease. (Martin Affidavit at ¶ 4.) At the conclusion of the asset purchase, Bill Berger and Ed McGill controlled the Debtor. (Martin Affidavit at ¶ 5.) Louis R. Capozzoli had no role in the operation or management of the Debtor. (Martin Affidavit at ¶ 5.) Louis R. Capozzoli's only interest was the ability to take control of the Debtor in the event of default of certain financial obligations of the Debtor to himself as set forth in a Close Corporation Agreement. (Martin Affidavit at ¶ 5.)

In 1996, the Debtor needed cash for operations. (Martin Affidavit at ¶ 7.) At the time, the Debtor was managed by Sheldon Turner (Martin Affidavit at ¶ 7) and the Debtor's controlling shareholder was Louis R. Capozzoli (Capozzoli Affidavit at ¶ 1). Louis R. Capozzoli provided the cash and L & D drafted certain documents. (Martin Affidavit at ¶ 7.) Specifically, as of March 29, 1996, Louis R. Capozzoli entered into a series of transactions with the Debtor. (Capozzoli Affidavit at ¶ 2.) By these transactions, Louis R. Capozzoli, among other things: (1) loaned the Debtor $300,000.00 for working capital; (2) entered into a Stock Purchase Agreement; (3) financed the Debtor's redemption of his stock; (4) entered into a Guaranty Fee Agreement; and (5) obtained a Mortgage as security for the loans that he extended to the Debtor. (Capozzoli Affidavit at ¶ 2.) All of the documentation regarding the foregoing transactions was prepared solely by law firm of L & D. (Capozzoli Affidavit

at ¶ 3.) L & D, however, dealt primarily, if not exclusively, with Sheldon Turner. (Martin Affidavit at ¶ 7.) At all times, L & D billed the Debtor for its services and it was the Debtor who paid the bills of L & D. (Martin Affidavit at ¶ 7.)

At the time, it was Louis R. Capozzoli's understanding that L & D was acting on behalf of both the Debtor and himself. (Capozzoli Affidavit at ¶ 3.) Louis R. Capozzoli does not recall L & D ever advising him to the contrary. (Capozzoli Affidavit at ¶ 3.) Specifically, when Louis R. Capozzoli received written documentation from L & D for review and signature, Louis R. Capozzoli does not recall being told by L & D that he needed separate representation. (Capozzoli Affidavit at ¶ 3.) For this reason, Louis R. Capozzoli did not retain the services of separate counsel but relied solely on L & D to prepare the necessary legal documents and protect the interests of all parties to the transactions. (Capozzoli Affidavit at ¶ 3.) These transactions enabled L & D to gain certain information regarding Louis R. Capozzoli's personal and business affairs which otherwise would not have been available to L & D. (Capozzoli Affidavit at ¶ 4.)

At no time has Louis R. Capozzoli been involved in the management of the Debtor. (Martin Affidavit at ¶ 9.) During L & D's years of representation of the Debtor, Thomas E. Martin did have conversations with Louis R. Capozzoli. (Martin Affidavit at ¶ 10.) However, L & D never reported to Louis R. Capozzoli as the individual in charge of the Debtor's operations. (Martin Affidavit at ¶ 10.) Louis R. Capozzoli was unable to become involved in the operations of the Debtor because he had his own commercial printing enterprise and business interests in New York and Puerto Rico. (Martin Affidavit at ¶ 10.)

The Debtor filed a Chapter 11 petition on September 4, 1997. On January 7, 1998, the Court entered an order approving the employment of L & D as attorneys for the Debtor. In September 1997,

James C. Frooman ("Frooman"), an attorney practicing with L & D, assumed all responsibility for the Debtor's representation by L & D. (Frooman Affidavit II at ¶ 1–2; Martin Affidavit at ¶ 11.) When Frooman became involved in L & D's representation of the Debtor, Sheldon Turner was in charge of the Debtor's operations. (Frooman Affidavit II at ¶ 3.) Frooman had no contact with Louis R. Capozzoli. (Frooman Affidavit II at ¶ 3.) Sheldon Turner made the decision to have the Debtor file its Chapter 11 petition. (Frooman Affidavit II at ¶ 4.) In connection with the preparation of the bankruptcy petition, Frooman prepared the corporate resolutions authorizing the filing of the case. (Frooman Affidavit II at ¶ 4.) Frooman gave the resolutions to Sheldon Turner who was to obtain Louis R. Capozzoli's signature. (Frooman Affidavit II at ¶ 4.) Shortly thereafter, Louis R. Capozzoli called Frooman to talk about the filing of the bankruptcy and his execution of the corporate resolutions authorizing the Chapter 11 petition. (Frooman Affidavit II at ¶ 5.) This was the first time that Frooman spoke with Louis R. Capozzoli. (Frooman Affidavit II at ¶ 5.) At this time, Frooman instructed Louis R. Capozzoli that L & D represented the Debtor and not Louis R. Capozzoli. (Frooman Affidavit II at ¶ 5.) Frooman recommended that Louis R. Capozzoli retain his own legal counsel. (Frooman Affidavit II at ¶ 5.) Louis R. Capozzoli did not do so. (Frooman Affidavit II at ¶ 5.)

Subsequent to the filing of the bankruptcy petition, Louis R. Capozzoli called Frooman on numerous occasions to discuss various aspects of the case and his own interests. (Frooman Affidavit II at ¶ 6.) On each of these occasions, Frooman advised Louis R. Capozzoli that L & D represented the Debtor and not Louis R. Capozzoli. (Frooman Affidavit II at ¶ 6.) Frooman again urged Louis R. Capozzoli to retain his own legal counsel. (Frooman Affidavit II at ¶ 6.) After missing the deadline to file his proof of claim, Louis R. Capozzoli retained the attorney that repre-

sents him in this proceeding. (Frooman Affidavit II at ¶ 7.)

On October 26, 1998, the Debtor, through its attorneys of L & D and Frooman, commenced this adversary proceeding against the Defendants. On December 1, 1998, the Court entered an order converting the case from Chapter 11 to Chapter 7. On December 8, 1998, the Trustee was appointed. By his Application, the Trustee contends that the employment of L & D and Frooman as attorneys for the Trustee should be approved, for among other reasons, because: (1) Frooman is the most familiar with the developments in the Debtor's case that serve as the basis for many of the allegations in the complaint; and (2) L & D and Frooman propose to represent the Trustee on a contingent fee basis, receiving one-third of any amounts they collect for the benefit of the estate, assuring creditors that the bulk of the recovery will not be consumed by legal fees.

**II**

The Capozzolis argue that the Trustee should not be permitted to employ Frooman and L & D because such employment would create an impermissible conflict of interest and the appearance of impropriety in that Frooman and L & D would be prosecuting an action against Louis R. Capozzoli, who the Capozzolis contend is a former client. Specifically, the Capozzolis argue that Louis R. Capozzoli reasonably believed that he was represented by Martin, Frooman and L & D both before and after the date the Debtor filed its bankruptcy petition. The Trustee, on the other hand, argues that Martin, Frooman and L & D never represented Louis R. Capozzoli but only the Debtor.

■■■ Although the Trustee's Application is made pursuant to 11 U.S.C. § 327, the Capozzolis' objection is based upon state law standards of professional responsibility. *See* Ohio Code of Professional Responsibility Canon 4 (A Lawyer Should

Preserve the Confidences and Secrets of a Client); Ohio Code of Professional Responsibility Canon 5 (A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client); Ohio Code of Professional Responsibility Canon 9 (A Lawyer Should Avoid Even the Appearance of Professional Impropriety). "Attorneys who practice before a bankruptcy court must not only concern themselves with the obligations set forth in the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, but also with the application of state ethical rules." *In re Soulisak*, 227 B.R. 77, 80 (Bankr.E.D.Va. 1998). Not only do state laws of professional responsibility apply in bankruptcy, but bankruptcy courts can enforce these laws through, among other mechanisms, disqualification of counsel or disapproval of the appointment of counsel. *See In re Vanderbilt Assocs., Ltd.*, 117 B.R. 678, 680 (D.Utah 1990) (noting that ethical rules apply to question of whether an attorney can be employed pursuant to § 327); *In re RKC Dev. Corp.*, 205 B.R. 869, 873 (Bankr. S.D.Ohio 1997) (concluding that appointment under § 327 should be refused where retention is at variance with ethical and disciplinary rules); *In re Sauer*, 191 B.R. 402, 407 (Bankr.D.Neb.1995) (disqualifying counsel for failure to observe applicable state ethics code).

The Capozzolis place great emphasis upon the Debtor's status as a closely-held corporation. They argue that when a law firm represents a closely-held corporation, the dynamics of the situation necessarily lead to the conclusion that the law firm also represents the officers, directors and shareholders of the corporation. As a result, the Capozzolis contend, attorneys who represent a closely-held corporation should not represent a plaintiff in a subsequent lawsuit against an officer, director or shareholder of the corporation because such representation would create a conflict of interest and the appearance of impropriety. In support of this position the Capozzolis rely upon *In re Banks*, 283 Or. 459, 584 P.2d 284 (1978).

*Banks* concerned a disciplinary proceeding brought by the Oregon State Bar against two partners in a large law firm. United Medical Laboratories ("UML") was a corporation that operated a medical testing laboratory. The founder and president of UML was R.S. Michel ("Michel"). The stock of UML was held by Michel, his wife and his two daughters. The board of UML was composed of the same four individuals. Michel also owned and controlled a separate corporation, UML Leasing ("Leasing"), that leased equipment to UML. One of the attorneys, Douglas M. Thompson ("Thompson"), handled estate planning and other personal matters for the Michels. He also represented UML in its business transactions. The other attorney, Roland F. Banks ("Banks"), handled UML's litigation. All attorney's fees were billed to UML regardless of whether the legal services performed involved corporate matters or matters personal to the Michels.

Michel entered into a ten-year employment contract with UML. The contract was drafted by Thompson. Michel signed the contract without the benefit of separate counsel. UML subsequently encountered financial difficulty. Division arose between Michel, on the one hand, and his wife and daughters. As a result, the board of UML changed in composition. The bank that provided financing for UML requested, as a condition to its continued advancement of operating funds, that Leasing subordinate its claims against UML to the claims of the bank. Michel refused to subordinate the claims of Leasing to those of the bank. Pursuant to a request of the new board of UML, Banks rendered an opinion to the board concluding that Michel's failure to cooperate with the proposed subordination violated his employment contract with UML. Eventually, UML was sold and Michel was retained by the purchasers to operate the business. Michel terminated, among oth-

ers, Banks, Thompson and their law firm as attorneys for the corporation.

One of several issues before the court was whether the law firm could advise UML that Michel's refusal to subordinate the claims of Leasing constituted a breach of the very employment contract that the firm drafted and Michel executed without separate counsel. The attorneys argued: (1) the firm represented UML and not Michel; (2) the employment contract was drafted for UML in the course of the firm's representation of UML; (3) UML paid for the firm's services in drafting the contract; (4) the firm's exclusive duty was to UML; and (5) as a result, it was obligated to advise UML regarding the board's request for a legal opinion. The court ultimately concluded that such conduct violated DR 5–105 (Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer) of the Oregon Code of Professional Responsibility and issued a public reprimand. *Banks,* 584 P.2d at 296.

The court noted the traditional rule that an attorney for a corporation represents only the corporation and not shareholders, directors, officers or employees of the corporation. However, it concluded that the facts before it constituted "a logical exception" to the general rule. *Id.* at 292. The relevant facts were summarized by the court as follows:

> At the time of the drawing of the contract, Michel was the corporation.... The stock had been distributed among the members of the family, but, for practical purposes, it was his corporation. He was in absolute control and substantially all the immediate benefits of the business could be made to flow to him through his contract for compensation.... It is small wonder that as a layman Michel was completely outraged when he found that the attorneys he thought he had hired to protect his interests, both personal and corporate, which interests were substantially iden-

tical, were opposing him in a dispute calling into question the application of the legal work he had hired them to do. *Id.* at 290–91. The Oregon Supreme Court went on to reason that:

> In weighing the interests of the corporation and the desirability of avoiding conflicts of interest, it seems to us that the balance should be struck the other way in closely held family corporations where the operator of the corporation either owns or controls the stock in such a manner that it is reasonable to assume that there is no real reason for him to differentiate in his mind between his own and corporate interests. In such a situation ... there is no basis for the individual to believe that the attorney has or ever will have other than his individual interest at heart. It is our conclusion that the only ethical position for an attorney to adopt when substantially identical interests which he has represented become divergent is to represent neither the individual nor the corporation.

*Id.* at 292.

■ At the August 25, 1999 hearing, the Capozzolis argued that *Banks* establishes a per se rule prohibiting counsel for a closely-held corporation from representing a plaintiff in a subsequent action against one of the shareholders, directors, officers or employees of the corporation. The Court disagrees. The Oregon Supreme Court qualified its ruling as follows:

> We realize that whether, at the time of the original representation, the interests of the individual and the corporation were sufficiently identical to justify ignoring the corporate entity is a question of degree, and there will be many cases close to that non-exact line between the permissible and the impermissible.

*Id.* Had the court intended to create a per se rule, it would have concerned itself only with the issue of whether UML was a closely-held corporation and not whether

"the interests of the individual and the corporation were sufficiently identical to justify ignoring the corporate entity." *See id.* Moreover, the Capozzolis' construction of *Banks* would lead to a bright-line rule. To the contrary, the *Banks* court referred to a "non-exact line between the permissible and the impermissible." *See id.* Even if the Court were to assume that *Banks* stands for the proposition that the Capozzolis advance, the better approach is to examine the facts of each case to determine whether an attorney-client relationship arose between the corporate attorneys and the shareholder, director, officer or employee in question. *See Bobbitt v. Victorian House, Inc.,* 545 F.Supp. 1124, 1126 (N.D.Ill.1982) (concluding that representation of a closely-held corporation does not inherently mean that the attorney for the corporation also represents the individual constituents of the corporation; issue must be determined by the facts of each case); *Terre Du Lac Property Owners' Ass'n, Inc. v. Shrum,* 661 S.W.2d 45, 48 (Mo.Ct.App.1983) (citing *Bobbitt* with approval).

The foregoing approach was adopted by Judge Bentz under circumstances quite similar to the matter before the Court. *See Agresti v. Rosenkranz (In re United Utensils Corp.),* 141 B.R. 306 (Bankr. W.D.Pa.1992). The debtor in *Utensils* filed a chapter 11 petition and the case was subsequently converted to chapter 7. Initially, the debtor operated as a debtor-in-possession. At that time, the debtor-in-possession obtained court approval to employ Lawrence C. Bolla ("Bolla") and the law firm of Quinn, Gent, Buseck & Leemhuis, Inc. ("Quinn"). While the case was pending under chapter 11, a trustee was appointed and the trustee obtained authorization to employ Bolla and Quinn as attorneys. After the case was converted to chapter 7, the trustee filed an adversary proceeding against, among others, the president and sole shareholder of the debtor corporation ("Rosenkranz") to recover alleged fraudulent, preferential, and post-petition transfers. Rosenkranz moved to

disqualify Bolla and Quinn based upon the allegation that Bolla not only served as counsel for the debtor but also for Rosenkranz personally and, as a result, Bolla possessed confidential information about Rosenkranz that precluded Bolla and Quinn from representing the trustee.

Like the Capozzolis, Rosenkranz argued that "in a close corporation or at least in a case where the principal executive officer is the single 100% shareholder, an attorney who represents the corporation necessarily represents the stockholder." *Id.* at 308. The court rejected this argument, noting that "[a]n attorney for a corporation does not by virtue of that fact necessarily create an attorney-client relationship with its officers, directors, shareholders, or other third parties affiliated with the corporation." *Id.* Instead, the court determined that it must examine the particular facts of the matter to determine whether an attorney-client relationship was established between Bolla and Rosenkranz. *Id.* at 309. Accordingly, the court ruled that Rosenkranz would be provided the opportunity to present evidence of the existence of an attorney-client relationship with Bolla and Quinn that would justify their disqualification as counsel for the trustee. *Id.*

Although the Court does not believe that the per se rule advocated by the Capozzolis is appropriate, this is not to say that *Banks* is unpersuasive. To the contrary, this Court agrees with the holding of the Oregon Supreme Court given the facts of that case. The issue before this Court is whether the facts in this matter similarly compel the finding of an attorney-client relationship between Capozzoli and L & D. Certainly, the closer that the facts of any case approach the facts of *Banks,* the more likely it is that an attorney-client relationship was established between the corporate attorneys and the constituents.

### III

"Though the districts of this state do not express the sine qua non of an

attorney-client relationship in the same language, the consensus seems to be that such a relationship is governed by whether the putative client reasonably believed that he had entered into a confidential relationship with the attorney." *Lillback v. Metropolitan Life Ins. Co.,* 94 Ohio App.3d 100, 108, 640 N.E.2d 250, 256 (1994). As noted earlier, the Capozzolis take the position that an attorney-client relationship existed both before and after the filing of the bankruptcy petition on September 4, 1997. With respect to the postpetition relationship between Louis R. Capozzoli and Frooman and L & D, the record does not establish that Louis R. Capozzoli's belief in the existence of an attorney-client relationship was reasonable. The very first time that Frooman interacted with Louis R. Capozzoli regarding the latter's signing of the corporate resolutions authorizing the bankruptcy petition, Frooman told Louis R. Capozzoli that L & D represented the Debtor and not Louis R. Capozzoli. Frooman further instructed Louis R. Capozzoli to retain his own legal counsel. Each time thereafter that Louis R. Capozzoli contacted Frooman, Frooman advised Louis R. Capozzoli that L & D represented only the Debtor and that Louis R. Capozzoli should retain separate legal counsel. Under these circumstances, the Court does not believe that Louis R. Capozzoli could have reasonably believed that he had entered into a confidential relationship with Frooman and L & D.

The prepetition exchange between Louis R. Capozzoli and Martin and L & D, however, is more ambiguous. In 1996, Louis R. Capozzoli entered into a series of transactions with the Debtor, with all of the relevant documentation being prepared by L & D, at a time when Louis R. Capozzoli was not represented by separate counsel. These facts are quite similar to *Banks* where Michel entered into an employment contract with UML that was drafted by Thompson and his firm at a time when Michel was not represented by

separate counsel. There are some distinctions however. In *Banks,* Michel had previously engaged Thompson to handle some estate planning for Michel and his family. In this matter, Louis R. Capozzoli never used L & D for personal legal services wholly separate from corporate matters. Moreover, in *Banks,* Michel was responsible for UML seeking out the services of Thompson and his firm to represent the corporation. Under such circumstances, it is easier to see how the shareholder of the close corporation could be misled into thinking that corporate counsel was going to look after his or her interests as well. In this matter, Bill Berger and Ed McGill were responsible for the retention of L & D as counsel for the Debtor. This distinction is further emphasized by the fact that Louis R. Capozzoli retained separate counsel to represent his interests during the formation of the corporation. This would lead one to believe that Louis R. Capozzoli was well aware of the fact that L & D represented the corporation and not his individual interests.

Nevertheless, three years elapsed between the time of the formation of the corporation and the 1996 transactions between Louis R. Capozzoli and the Debtor. There is no record that Martin or any other attorney from L & D advised Louis R. Capozzoli that L & D represented only the Debtor and that Louis R. Capozzoli should retain separate counsel before executing any of the documents prepared by L & D in 1996. Moreover, like *Banks,* there is nothing in the record that would have led Louis R. Capozzoli to believe that his interests differed from those of the corporation at this time. For these reasons, the Court concludes that it was reasonable for Louis R. Capozzoli to believe that he had entered into a confidential relationship with L & D regarding his representation in the 1996 transactions. *See State v. Green,* 936 P.2d 947, 956 (Okla.1997) ("[A]n attorney may be found to have impliedly agreed to provide legal services when the person seeking them reasonably relies on the attorney to pro-

vide the services, and the attorney, aware of the reliance, does nothing to negate the belief."); *McVaney v. Baird, Holm, McEachen, Pedersen, Hamann & Strasheim,* 237 Neb. 451, 466 N.W.2d 499, 501–02 (1991) (same); *Kurtenbach v. TeKippe,* 260 N.W.2d 53, 56 (Iowa 1977) (same). If L & D wanted to preserve its ability to represent the Debtor in subsequent actions against Louis R. Capozzoli, it could have simply informed Louis R. Capozzoli that it represented the Debtor only in the 1996 transactions and that Louis R. Capozzoli should obtain separate counsel. Although the record is clear that Mr. Frooman did this postpetition, Mr. Martin did not do this prepetition.

## IV

■ Even though an attorney-client relationship was established, there exists an additional issue the neither party to this action has addressed. Case law dictates that even if an attorney for a corporation represents it in an action against a shareholder, director, officer or employee who previously entered into an attorney-client relationship with the corporate attorney, the corporate attorney is not disqualified unless the two representations are substantially related. *See Vinci v. Ceraolo,* 79 Ohio App.3d 640, 647, 607 N.E.2d 1079, 1084 (1992). This additional requirement "fulfills the purpose of enforcing the lawyer's duty of absolute fidelity and guarding against the danger of inadvertent use of confidential information." *Vinci,* 79 Ohio App.3d at 647–48, 607 N.E.2d at 1084.

■ *Vinci* is particularly compelling due to its similarity to the matter before the Court. In *Vinci,* the defendant moved for the disqualification of the plaintiff corporation's counsel based upon the defendant's allegation that he owned half of the shares of the corporation. The trial court denied the motion and the defendant appealed. Although the appellate court affirmed the trial court ruling on the ground that the defendant never established his ownership

interest in the corporation, it nevertheless identified the standard for disqualification under such circumstances as follows:

An attorney may not represent a client in litigation against a former client if the former and current representations are both adverse and substantially related.

*Vinci,* 79 Ohio App.3d at 647, 607 N.E.2d at 1084; *accord Majestic Steel Serv., Inc. v. Disabato,* No. 76540, 1999 WL 961465, at *2 (Ohio Ct.App. Oct. 21, 1999) (noting that disqualification by former client requires: (1) a former attorney-client relationship; (2) substantial relationship between the subject matter of the two representations; and (3) disclosure of confidential information in former representation); *Phillips v. Haidet,* 119 Ohio App.3d 322, 324–25, 695 N.E.2d 292, 294 (1997) (same). Consequently, had the defendant established the existence of an ownership interest in the corporation, he would have nevertheless had to satisfy the foregoing standard of substantial relatedness. Accordingly, this Court must determine whether the opposing representations by L & D are substantially related.

■ "[M]atters are substantially related if there is some 'commonality of issues' or a 'clear connection' between the subject matter of the former representation and that of the subsequent adverse representation." *Majestic Steel,* 1999 WL 961465, at *3 (citing *Phillips,* 119 Ohio App.3d at 327, 695 N.E.2d at 296). In this matter, the Court finds that there is a substantial relationship between the Trustee's action and L & D's prior representation of Louis R. Capozzoli. The complaint ("Complaint") (Doc. 1) filed in this proceeding on October 26, 1998, asserts five separate claims against the Defendants. The first of these claims seeks to enjoin the Defendants from liquidating or removing certain bonds alleged to have been pledged to North Side Bank & Trust by Louis R. Capozzoli as collateral for a limited guarantee. Claims two through four

seek damages, both compensatory and punitive, for Louis R. Capozzoli's alleged failure to consummate a purchase of the Debtor's assets arising from a September 29, 1998 sale. The Court does not find that these actions bear a substantial relationship to L & D's 1996 representation of Louis R. Capozzoli regarding the drafting and execution of certain promissory notes and agreements. To the contrary, the alleged conduct of Louis R. Capozzoli that serves as the basis for these four claims bears little to no relation to the 1996 transactions between Louis R. Capozzoli and the Debtor. However, the same cannot be said of the fifth claim raised in the Complaint.

By the fifth claim asserted in the Complaint, the Trustee seeks to recover alleged preferential transfers made by the Debtor to Louis R. Capozzoli. Significantly, the Complaint alleges that "[s]aid payments by Debtor to [Louis R.] Capozzoli were characterized as interest on loans in the amount of $77,912.00 and 'guarantee fees' of $28,000.00." (Complaint at ¶ 33.) The documentation attached to Louis R. Capozzoli's Proof of Claim reveals that the only loans that he made to the Debtor arose from two separate promissory notes executed by the Debtor on March 29, 1996. These are two of the documents that L & D drafted at the time that an attorney-client relationship existed between itself and Louis R. Capozzoli. Another document drafted on the same date under the same circumstances is a Guarantee Fee Agreement providing a guarantee fee of $4,000.00 per month from the Debtor to Louis R. Capozzoli as long as the latter continues to guarantee the obligations of the Debtor to North Side Bank & Trust. From the foregoing, it is clear that L & D, at a time when it had entered into an attorney-client relationship with Louis R. Capozzoli, drafted the documents that have resulted in the interest payments and guarantee fees that the Trustee now seeks to avoid as preferential transfers. Consequently, there is a clear connection between the subject matter of the former representation of Louis R. Capozzoli by L & D and that of the Trustee's preference action that he seeks to employ L & D to prosecute. *See Majestic Steel,* 1999 WL 961465, at *3. The record is clear that Louis R. Capozzoli provided L & D with confidential information during the former attorney-client relationship that is substantially related to the Trustee's current action. As such, L & D cannot be permitted to represent the Trustee in the current adversary proceeding under the authority of the Ohio Code of Professional Responsibility and the case law that construes its conflicts provisions. *See Vinci,* 79 Ohio App.3d at 647, 607 N.E.2d at 1084; *Majestic Steel,* 1999 WL 961465, at *2; *Phillips,* 119 Ohio App.3d at 324–25, 695 N.E.2d at 294.

**V**

For the foregoing reasons, the Court will DENY the Application of Trustee to Employ Counsel (Doc. 20), filed on June 16, 1999. An order to this effect will be entered.