Argued and submitted December 30, 1982, accused reprimanded March 8, 1983

# In re Complaint as to the Conduct of
## WILLIAM H. KINSEY,
*Accused.*

### (OSB 80-49, SC 28742)

660 P2d 660

Jack L. Kennedy, of Kennedy & King, Portland, argued the cause and filed the brief for the accused.

Garry P. McMurry, Portland, argued the cause for the Oregon State Bar. With him on the brief were Ronald L. Wade and Rankin, McMurry, VavRosky & Doherty, Portland.

Before Lent, Chief Justice, Linde, Peterson, Campbell, Roberts and Carson, Justices, and Jones, Justice Pro Tempore.

PER CURIAM

## PER CURIAM

This is a disciplinary proceeding brought by the Oregon State Bar against William H. Kinsey, who practiced law in a large firm's business department. He has been a member of the Oregon State Bar since 1948. This case interprets disciplinary rules involving the ethical duty of a lawyer when confronted with employment by clients having conflicting interests.

The complaint contains three charges. The first two allege that the accused accepted and continued in the employment of clients having conflicting interests, in violation of DR 5-105(A) and (B). The third charge alleges that the accused violated DR 5-102(A) by defending his clients in a stockholder derivative suit when it was obvious that the accused ought to have been called as a witness on behalf of his clients.

After considering the evidence admitted at the hearing and the arguments of counsel, a majority of the trial board found the accused guilty of the second charge, but not guilty on the first and third charges. The majority recommended a penalty no more severe than a public reprimand on the second charge.

The Disciplinary Review Board found the accused not guilty of all charges. We make the following findings based on our independent review of the evidence. *In re Robeson,* 293 Or 610, 629, 652 P2d 336 (1982); *In re Chambers,* 292 Or 670, 642 P2d 286 (1982); *In re Galton,* 289 Or 565, 615 P2d 317 (1980).

Kim Lundgren and F.R. Klinicki had become friends while serving as fellow employees of Pan American Airways, piloting aircraft to and from Berlin. They took leave from their Pan American Airways employment to seek entry into the air carrier market in Berlin through an air taxi service. They hoped to expand this initial service into a more substantial and regular air carrier business. Kim Lundgren's father, Leonard Lundgren, an Oregon businessman, was invited to join the venture. It was agreed that a corporation should be formed in which Kim Lundgren and his father would combine as stockholders with F.R. Klinicki.

The accused and his Portland law firm had previously represented Leonard Lundgren in several tax and business matters. In 1977, the Lundgrens, with the consent of Klinicki, employed the accused and his firm to organize a corporation called Berlinair, Inc. (Berlinair) and to act as its corporate counsel. Klinicki knew that the accused and his firm had represented Leonard Lundgren on previous matters.

The accused and his firm organized Berlinair as an Oregon corporation in 1977. Kim Lundgren was initially the sole subscriber of all capital stock of the corporation, but the corporation's capital stock was eventually issued in 1978 to Kim Lundgren (100 shares), Lelco, Inc., a corporation whose stock was entirely owned by the two Lundgrens (100 shares), F.R. Klinicki (100 shares), and the accused (3 shares). The accused, the Lundgrens, Kim Lundgren's spouse and Klinicki were the five directors of the corporation at this time.

When Berlinair was organized, all stockholders understood that its initial purpose would be to operate an air taxi service in and out of Berlin, but with the further intent of using this service as a foothold for gaining more substantial business as an air carrier to and from Berlin.

In 1978, Berlinair applied for rights as an air carrier between Berlin and Saarbrucken, West Germany. The plan was to obtain the rights first, and then use the governmental grant of these rights as a means of obtaining financing to acquire the aircraft and equipment needed to perform the service. On May 30, 1978, the accused as counsel to the corporation traveled to Germany to assist in presenting an application to the air attaches of the United States, Great Britain and France. The attaches made it known that a financing commitment would be required before they would consider Berlinair's application.

While on his trip to Berlin, the accused was told by the Lundgrens that they were considering the possibility of obtaining an advance financing commitment using the personal guaranties of Leonard Lundgren. The accused also knew that Leonard Lundgren would not give a guaranty for the debt of a corporation in which the minority stockholder,

Klinicki, had pre-emptive rights to future stock issued by the corporation.

On June 1, 1978, during an informal dinner at the Journalist Club in West Berlin attended by Kim Lundgren, Klinicki and the accused, the possibility of organizing a separate corporation to pursue the Saarbrucken application with an advance financing commitment was discussed. Klinicki said that he wanted equivalent ownership participation in any such new corporation. While the discussion at this time was in the context of the Saarbrucken application, the accused understood that Klinicki's position would be the same as to any other opportunity for air service in and out of Berlin that might arise in the future.

The evidence is in conflict as to whether the accused assured Klinicki that he would have the right to equivalent ownership in any such new corporation. Klinicki testified the accused so advised him at the Journalist Club in West Berlin on June 1, 1978. We find that the accused never gave any assurance to Klinicki that he would have the right to equivalent ownership in any such new corporation.

On June 9, 1978, the accused had a conference with the Lundgrens and was informed that Kim Lundgren and Klinicki were then at odds personally. The accused was asked to advise the Lundgrens how they could separate their business interests from Klinicki. The accused suggested a buy-out by one of the contending factions of the other's stock ownership in Berlinair.

On July 7, 1978, Kim Lundgren requested the accused form a new corporation for the purpose of pursuing the possibility of contracting with Berlin Flug Ring, a consortium of travel agencies, to fly tourists between Berlin and various other points in Europe. The Lundgrens desired to have the stock of this corporation owned by themselves or by Lelco, Inc., without participation by Klinicki. Kim Lundgren asked the accused at this conference whether the Lundgrens were legally required to include Klinicki as a stockholder in the new corporation to be formed to pursue the Berlin Flug Ring business. The accused viewed the question as whether the Lundgrens were required to

choose between entering the Berlin Flug Ring deal with Klinicki as a participant, or foregoing this business opportunity. The accused told Kim Lundgren at this conference that it was not necessary to face up to this question until it was determined whether obtaining the contract would require a financing commitment supported by more than the contract itself, and, if so, the nature and extent of such financing. The accused was of the opinion that if financing commitments were required beyond security of the Berlin Flug Ring contract itself, such as guaranties by Leonard Lundgren or other methods of financing beyond the financial capacity of Klinicki on a pro rata basis, then there would be no legal obligation of the Lundgrens to offer Klinicki an opportunity to participate. If, on the other hand, the business would be "self-financing" through the security of the contract itself with Berlin Flug Ring, then Klinicki would have a right to participate pro rata in the new corporation, to the same extent as his participation in Berlinair.

On July 11, 1978, the accused organized Air Berlin Charter Co. (ABC) as an Oregon corporation, and prepared a subscription by Lelco, Inc. for all of the outstanding shares of its capital stock. The accused did not inform Klinicki of the organization of ABC or of the subscription for its capital stock, nor did he believe that the Lundgrens had informed Klinicki of these developments.

The accused knew from at least July 7, 1978, that organization of ABC and its pursuit of a contract with Berlin Flug Ring, with Klinicki excluded from an opportunity to participate as a shareholder, presented a question of whether Berlinair was being wrongfully deprived of a corporate opportunity.

The accused was unaware that ABC actually obtained a contract with Berlin Flug Ring on September 1, 1978, until a stockholder derivative suit was filed by Klinicki and served on October 4, 1978. The parties to the lawsuit were: F.R. Klinicki v. Kim S. Lundgren, Berlinair, Inc., an Oregon corporation, and Air Berlin Charter Company, an Oregon corporation. The accused was not named as a defendant in that suit and a stipulation was reached between the accused and Klinicki's lawyers that he would

not be called as a witness and that the accused's law firm could represent all the defendants in the lawsuit. During the course of the trial, then Circuit Judge Van Hoomissen became concerned about the possible conflict of interest of the accused and warned the accused in the following discussion *sua sponte* with counsel.

"THE COURT: It seems to me that we have a prima facie case of unethical conduct here on the part of Mr. Kinsey. Now, I may have misread this case, and I'm not the grievance committee of the Bar, but I want the record to reflect that I have discussed this with counsel and I am very, very concerned. And I might add out of the presence of the jury, that if this case does go to the jury, I think Mr. Klinicki's statement to the effect that, 'If you can't trust a lawyer, who can you trust?' is going to be very damning to these Defendants. And to a certain extent, it may deny their opportunity to get a fair trial on the question of punitive damages if I submit that issue to the jury. I don't know what you want to do but — and I also want to make it absolutely clear to both you gentlemen that the Plaintiff's lawyers did not raise this question with me. I was alerted to it as I listened to the testimony and then yesterday I got the case of *In Re Banks* [283 Or 459, 584 P2d 284 (1978)] and read it last night. And the more I think about it, the more I think it is a prima facie violation, if not an actual violation. What, if anything, does anybody want to do? I have ruled on the objection, I'm ready to go to trial. Where do we go from here?

"MR. LITTLEFIELD [Klinicki's counsel]: You mean inasfar as the subject matter that you just raised?

"THE COURT: * * * What I want to know is shall we return and complete the case or —

"* * * * *

"MR. EGENES [Klinicki's counsel]: * * * I think the jury will drop the roof on these Defendants if they get a chance. Human nature tells me that if people can spank a lawyer, they'll do it. * * *

"MR. KINSEY: May I look at that case?

"THE COURT: You mean on the basis of the matter that I have just discussed with you?

"* * * * *

"THE COURT: I would think, you know we're always reading these cases now about malpractice, and I'm just

speculating looking down the road, that if I send this case to the jury and they return a judgment for substantial punitive damages, that the Defendant might want to consider why the jury returned that verdict and why the judge let them deliberate on punitive damages. And just thinking out loud, the Defendant might talk to his lawyer in Bend or someone else and might say they weren't mad at you, Kim, they were mad at Mr. Kinsey. * * *

"* * * * *

"THE COURT: * * * The fact remains that Mr. Kinsey is an officer of this corporation and he's the corporate legal counsel and that he apparently had discussions and meetings and conferences with the Plaintiff — or with the Defendant, Kim Lundgren, and perhaps with other persons wherein they discussed matters that are material to the resolution of this suit. The Plaintiff is claiming that Kim Lundgren and his friends ·fraudulently took advantage of a corporate opportunity to the Plaintiff's damage. It does appear to me to be a matter of fact that Mr. Kinsey participated in that and may very well have violated his trust as a director, an officer and attorney for that corporation. Now, those are facts and that's relevant.

"* * * * *

"THE COURT: * * * And I know for a fact that some fairly prominent attorneys in this community are well aware of the *Banks* case and its implications and are reviewing the way they conduct business.

"MR. FRANZKE: We are too.

"* * * * *

"MR. FRANZKE: In fairness to Mr. Kinsey, Judge, the *Banks* case is ex post facto. It is the first time Oregon ever said that, the opinion says so.

"THE COURT: I'm not saying that Mr. Kinsey intentionally went out to violate the ethical considerations, what I'm suggesting is that — and I certainly am not suggesting that Jerry Banks did so, I think perhaps that that is the way these things were done in the past. But they won't be done that way in the future because the *Banks* case has been decided. And it appears that Mr. Kinsey's involvement in this case occurred maybe simultaneously with Jerry Bank's participation in the U.M.L. transaction. I'm simply saying that we now have an opinion that says this kind of conduct is suspect, and if it is, and this goes up, I think the Supreme Court might very well say to Mr.

Kinsey the same thing they said to Mr. Banks, it is not ex post facto, he shouldn't have done this and we're going to reinforce our previous public announcement that lawyers are not to act this way. Because it seems to me that the — if not an actual conflict of interests, the potential for conflict of interest is patent. And I also think that if Mr. Kinsey had said to Mr. Lundgren, look, I can't represent you privately as you proceed to try to develop this business opportunity. That business opportunity, at least prima facie, belongs to the corporation, which I represent as legal counsel and on whose board I serve. At the very least we're going to have to make a full and complete disclosure to the principals of Berlinair and then if they don't want to pursue it or they don't want to put up some money, then we can go ahead. * * * It just seems to me — and I served on the ethics committee for three years — it seemed to me first that there is a conflict of interest on the part of Mr. Kinsey in this case, and I think that conclusion on my part is well founded. Secondly, if there isn't a conflict, the potential for conflict is so patent that Mr. Kinsey should have either made a full disclosure to Klinicki and anybody else who had a right to know the facts, or Mr. Kinsey should have withdrawn. * * * I guess we'll just have to go ahead and try the case and see what happens."

After this admonition by the court, the accused continued to act as co-trial counsel with his partner, Mr. Franzke.

The trial of Klinicki's shareholder derivative suit resulted in a finding that the organization of ABC at the request of Kim Lundgren and its entry into the contract with Berlin Flug Ring wrongfully deprived Berlinair and its shareholders of a corporate business opportunity. The decision of the Multnomah County Circuit Court is presently pending on appeal.[1] The Oregon State Bar filed its complaint June 25, 1981.

---

[1] On January 2, 1981, the trial court entered its Decree and Judgment Order as follows:

"1. Defendants' motions to dismiss Plaintiff's Fourth Cause of Action and to enter judgment thereon in favor of Defendants notwithstanding the verdict are granted and that Plaintiff have and recover nothing from Defendants, or either of them, and that Defendants, and each of them, have judgment against the Plaintiff thereon.

"2. A constructive trust is hereby imposed and Air Berlin Charter Company, its officers, directors, and their successors, are decreed to be constructive trustees for the benefit of Berlinair, Inc. of all of the stock of Air Berlin

## The First Charge

On the first charge of the Oregon State Bar against the accused of violation of DR 5-105(A), we find the accused guilty. DR 5-105(A) provides:

"Refusing to Accept or Continue Employment if the Interest of Another Client May Impair the Independent Professional Judgment of the Lawyer.

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C)."

---

Charter Company, the Berliner Flugring contract, the FAA Part 121 Certificate, all charter business, CAB and tri-party approved operating authority for scheduled and unscheduled routes, all profits, benefits, advantages, monies, funds, assets, facilities, and properties acquired as a result of organizing and establishing Air Berlin Charter Company as of July 7, 1978.

"3. Defendants, and each of them, shall account for all of the property and benefits enumerated in paragraph 2 as of July 7, 1978. Such accounting shall be filed within 60 days of the date of this Decree, or such other date that the court shall set upon application of Defendants.

"4. Such further hearings shall be held as may be necessary to implement the constructive trust and accounting herein decreed. Plaintiff may apply to the court of the appointment of a receiver or accountant to render the constructive trust and accounting effective if good cause therefor is shown at the time the application is made.

"5. Defendants are enjoined and restrained from transferring any and all properties and benefits as enumerated in paragraphs 2 and 3 without order of the court.

"6. Plaintiff's application for the remedy of dissolution and liquidation of Berlinair, Inc. is hereby denied.

"7. The plan for improving the financial structure of Berlinair, Inc. and the action of the board of directors of Berlinair, Inc. taken on September 28, 1979 is hereby cancelled and nullified. The stockholders of Berlinair, Inc. are restored to their respective positions as they existed prior to the plan, and Plaintiff is decreed a one-third owner of the stock of Berlinair, Inc. The indebtedness of Berlinair, Inc. to its stockholders which existed at the time the plan took effect and which was thereby converted to capital stock pursuant to the plan, are reinstated and again made debts of Berlinair, Inc. to the same extent as if the plan had not been adopted.

"8. Plaintiff is awarded judgment for attorney fees in the amount of $78,398.00 and $6,846.00 for litigation expenses incurred in this case incurred against Defendants Berlinair, Inc.

"9. Plaintiff shall have judgment against Air Berlin Charter Company for his costs and disbursements incurred herein.

"10. Execution shall issue on all sums due and payable."

DR 5-105(C)[2] is inapplicable. There was no consent to representation by Klinicki.

We agree with the trial board that "[t]here was no substantial reason for the Accused to believe that acceptance of proffered employment by both the Lundgrens individually and by Berlinair would give rise to any conflict between these clients when the Accused first accepted such employment. Thus, the Accused did not violate DR 5-105(A) in accepting employment initially by both the Lundgrens individually and Berlinair, Inc. as a corporate client." However, the charge of the Oregon State Bar against the accused of violation of DR 5-105(A) is as follows:

"XI

"From July 7, 1978 Accused accepted employment by Kim and Leonard Lundgren in the formation of Air Berlin Charter Co. and rendered advice to Kim and Leonard Lundgren and Air Berlin Charter Co. in violation of his ethical duty to decline such employment on the likelihood that his independent professional judgment as corporate counsel to Berlinair, Inc. and F. R. Klinicki, a principal stockholder thereof who reposed confidence in Accused, would be adversely affected, in violation of DR 5-105(A), Canon 5 of the Code of Professional Responsibility, as formally adopted by the Oregon State Bar and the Supreme Court of Oregon."

■ Clearly, the accused is guilty of accepting employment on July 7, 1978, by Kim and Leonard Lundgren in the formation of Air Berlin Charter Company and in rendering advice to the Lundgrens at that time how to defeat Klinicki and Berlinair in gaining an interest in ABC. He already owed a duty to Berlinair as corporate counsel to protect its corporate opportunities as will be discussed in our disposition of the second charge against the accused. There simply is no way to reconcile the obvious conflict. Any advice given to ABC on how to defeat Berlinair's interest in a corporate

---

[2] DR 5-105(C) provides:

"In the situations covered by DR 5-105 (A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

opportunity must necessarily be adverse to the corporation. Conversely, any advice to Berlinair regarding how to take advantage of a corporate opportunity would necessarily be adverse to the Lundgrens and ABC.

## The Second Charge

The second charge against the accused reads:

"VI.

"Since July 7, 1978 Accused has been guilty of unethical conduct in continuing his multiple employment as an attorney for Berlinair, Inc. and Air Berlin Charter Co. and Kim and Leonard Lundgren and by rendering professional advice to the Lundgrens and Air Berlin Charter Company while acting as corporate counsel to Berlinair, Inc. The professional advice the accused gave to the Lundgrens and to Air Berlin Charter Company was or was likely to be in conflict with the duty owed by Accused to Berlinair, Inc. and to a principal stockholder thereof, F.R. Klinicki, who reposed confidence in Accused as Berlinair, Inc.'s corporate counsel, in violation of DR 5-105(B), Canon 5 of the Code of Professional Responsibility, as formally adopted by the Oregon State Bar and the Supreme Court of Oregon."

DR 5-105(B) provides:

"A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C)."

■ We find the accused guilty of unethical conduct in continuing to represent the majority controlling stockholders (Lundgrens) and the corporation (Berlinair) after the parties were in conflict.

Simply stated, in a derivative suit a minority shareholder places himself in the shoes of the corporation to enforce a corporate right, and the interests of the plaintiff-shareholder and the corporate defendant become merged.[3]

The cause of action belongs to the corporation, but often (as in the instant case) the majority stockholders-directors are hostile and antagonistic to the

---

[3] *See, Conflicts of Interest Face Corporate Counsel Who Would Handle Stockholder's Derivative Suit,* 1979 Journal of Missouri Bar 555.

prosecution of the claim. As Justice Douglas noted in the stockholder's derivative suit of *Smith v. Sperling,* 354 US 91, 97, 77 S Ct 1112, 1119, 1 L Ed 2d 1205, 68 ALR2d 805 (1957), "[w]henever the management refuses to take action * * * or whenever, as in this case, it so solidly approves it that any demand to rescind would be futile, antagonism is evident."

Conceptually, the corporation, although a nominal defendant, *see Ross v. Bernhard,* 396 US 531, 90 S Ct 733, 24 L Ed 2d 729 (1970), is in actuality a party plaintiff because a successful suit will ostensibly benefit the corporation. In a derivative stockholder's action, a conflict of interest often develops between the majority stockholder defendants and the corporation. Consequently, we hold that the accused should not have represented the corporation or the majority stockholder defendants. Model Code of Professional Responsibility, EC 5-14, EC 5-15, EC 5-18,[4]

---

[4] EC 5-14 provides:

"Maintaining the independence of professional judgment required of a lawyer precludes his accpetance or continuation of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client. This problem arises whenever a lawyer is asked to represent two or more clients who may have differing interests, whether such interests be conflicting, inconsistent, diverse, or otherwise discordant."

EC 5-15 provides:

"If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation. A lawyer should never represent in litigation multiple clients with differing interests; and there are few situations in which he would be justified in representing in litigation multiple clients with potentially differing interests. If a lawyer accepted such employment and the interests did become actually differing, he would have to withdraw from employment with likelihood of resulting hardship on the clients; and for this reason it is preferable that he refuse the employment initially. On the other hand, there are many instances in which a lawyer may properly serve multiple clients having potentially differing interests in matters not involving litigation. If the interests vary only slightly, it is generally likely that the lawyer will not be subjected to an adverse influence and that he can retain his independent judgment on behalf of each client; and if the interests become differing, withdrawal is less likely to have a disruptive effect upon the causes of the clients."

EC 5-18 provides:

"A lawyer employed or retained by a corporation or similar entity owes his allegiance to the entity and not to a stockholder, director, officer, employee, representative, or other person connected with the entity. In advising

and Oregon DR 5-105(B). *See, In re Tonkon,* 292 Or 660, 664, 642 P2d 660 (1982).[5]

    Oregon's Ethical Considerations and Disciplinary Rules do not use the terminology "conflicts of interests." However, EC 5-18, in discussing a corporation attorney and his allegiance to the corporation, utilizes the term "differing interests." The ABA provides guidance by defining "differing interests":

> " 'Differing interests' include every interest that will adversely affect either the judgment or the loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest."[6] ABA Code of Professional Responsibility, Definition 1, p 454 (July, 1969).

The "differing interests" referred to in Oregon's EC 5-18 are the same as the ABA's definition of "differing interests" and hold that there is no distinguishable difference between "conflicting interests" and "differing interests."

    The ethical propriety of the dual representation of a corporation and director defendants in a derivative action is a question which has resulted in some split of authority. The split, however, seems to be only in point in time. A few

---

the entity, a lawyer should keep paramount its interests and his professional judgment should not be influenced by the personal desires of any person or organization. Occasionally a lawyer for an entity is requested by a stockholder, director, officer, employee, representative, or other person connected with the entity to represent him in an individual capacity; in such case the lawyer may serve the individual only if the lawyer is convinced that differing interests are not present."

[5] We said in *In re Tonkon,* 292 Or at 664:

"* * * the Ethical Considerations of the ABA's draft Code of Professional Responsibility were not included as part of the Code of Professional Responsibility proposed by the Oregon State Bar and adopted by this court on August 11, 1971. ORS 9.490. They were intended as guides to professional conduct but not as tests for disqualifying or otherwise disciplining members of the bar, which explains the careful use of 'should' instead of the 'shall' of the Disciplinary Rules. The Ethical Considerations have no official status as grounds for disciplinary action." (Footnotes omitted.)

*See, In re Bartlett,* 283 Or 487, 494 n 4, 584 P2d 296 (1978).

[6] The ABA noted:

"Until it was brought into the definitions section in the July 1979 final draft with only a minor grammatical change, this test was part of the last sentence of EC 5-12 (EC 6-12 in the tentative and preliminary drafts)."

older cases permitted dual representation.[7] However, more recent decisions establish that a potential conflict of interest exists when the same lawyer attempts to represent the nominal corporate defendant (Berlinair) in a derivative action while concurrently representing the corporate insiders (Lundgrens) accused of wrongdoing. *Murphy v. Washington American League Baseball Club, Inc.,* 116 US App DC 362, 324 F2d 394 (1968); *Lewis v. Shaffer Stores Company,* 218 F Supp 238 (SD NY 1963); 13 Fletcher, Cyclopedia of Private Corporations § 6025 (1970); *see also Yablonski v. United Mine Workers of America,* 145 US App DC 252, 448 F2d 1175, *cert den* 406 US 906 (1971).

In *Lewis,* the court held that sharing a single lawyer between the corporation and accused directors was improper: "Under all the circumstances * * * it would be wise for the corporation to retain independent counsel, who have had no previous connection with the corporation, to advise it as to the position it should take in this controversy. The interests of the officer, director and majority stockholder defendants in this action are clearly adverse * * *." *Lewis v. Shaffer Stores Company,* 218 F Supp at 239-40.

---

[7] *See, e.g., Hausman v. Buckley,* 299 F2d 696 (2nd Cir), *cert den* 369 US 885 (1962) (stockholder derivative action on behalf of a Venezuelan Corporation - court held that under applicable New York conflict of laws rules, Venezuelan law providing that stockholder may not bring suit on behalf of his corporation applied to bar the action. Consequently, attorneys representing corporation and individual in opposition to stockholder derivative action did not require striking of corporation answer as one interposed without independent counsel); *Selama-Dindings Plantations, Ltd. v. Durham,* 216 F Supp 104 (SD Ohio 1963), *aff'd* 337 F2d 949 (6th Cir 1964) (court held without discussion that it was not improper in a derivative suit for a law firm to represent both the corporate defendant and the individual directors when there was no conflict of interest and no breach of trust); *Otis & Co. v. Pennsylvania R. Co.,* 57 F Supp 680 (ED Pa 1944), *aff'd* 155 F2d 522 (3rd Cir 1946) (per curiam) (derivative suit alleging that the defendant officers breached their fiduciary duty to the corporation because they failed to "shop around for the best price on a new bond issue." The court concluded that since no fraud was alleged and the bond issue was floated under customary procedure, the corporation could file an answer and actively defend. The court also refused to remove counsel for the defendant corporation stating:

"* * * [T]here is no reason to require removal of counsel as petitioned. The corporation, as an interested party having a right to appear and defend, may select counsel as it chooses. Moreover, there is no allegation of any breach of confidence or trust of which either the corporations or the individual defendants complain * * *. Moreover, there are many stockholders' suits on record in which the same counsel represented both the individual and corporate defendants." 57 F Supp at 684.

In deciding *In re Banks,* 283 Or 459, 477 n 4, 584 P2d 284, 1 ALR4th 1105 (1978), we discussed the propriety of an attorney's conduct who has represented a corporation acting for the corporation in a controversy with an officer, director or stockholder and we advised Oregon attorneys to read *Cannon v. U.S. Acoustics Corporation,* 398 F Supp 209 (ND Ill 1975), *aff'd in relevant part* 532 F2d 1118, 119 (7th Cir 1976) (per curiam).

In *Cannon,* the district court made a probing and in-depth analysis of the precise problem before this court and concluded that a lawyer should be disqualified from simultaneously representing the corporation and controlling stockholders accused of improprieties, noting in addition to the conflict of interest, the further possibility that confidences obtained from one client might be used adversely to the other. In *Cannon,* the court said:

> "When a single lawyer or law firm undertakes to represent both the individual and corporate defendants in a derivative action, at least two potential ethical problems arise. First, there exists, as previously discussed, a potential conflict of interest between the individual and corporate defendants, and second, there is the threat that confidences and secrets obtained from each client may be jeopardized because of the dual nature of the representation. The CPR [Code of Professional Responsibility] addresses each of these problems in varying degrees of particularity. No code of ethics could establish unalterable rules governing all possible eventualities. Ultimately, therefore, the resolution of these problems rests in the reasoned discretion of the court.
>
> "Canon 5 of the CPR addresses the ethics of representing conflicting interests.[9] It provides that a lawyer 'Should

---

[9] The CPR is divided into 'three separate but interrelated parts: Canons, Ethical Considerations, and Disciplinary Rules.' The Canons are axiomatic norms embodying in general terms the standards of professional conduct which the legal system and the public expect from lawyers. From these Canons, the Ethical Considerations and Disciplinary Rules are drawn.

"The Ethical Considerations are 'objectives toward which every member of the legal profession should strive.' Moreover, they provide guidance for many specific situations which may confront a lawyer.

"The Disciplinary Rules are mandatory. They are minimum levels of conduct, the violation of which subjects the lawyer to disciplinary proceedings. *CPR,* 'Preliminary Statement,' February 20, 1970." *Cannon,* 398 F Supp at 215.

Exercise Independent Professional Judgment on Behalf of a Client.' Ethical consideration (hereinafter EC) 5-1 sets the Canon's overall objective:

> The professional judgment of a lawyer should be exercised solely for the benefit of his client and free from compromising influences and loyalties. . . . [T]he interest of other clients. . . should be permitted to dilute his loyalty to his client.

*See also* Annot, 31 ALR3rd 715 (1970).

At least one commentator has expressed some concern with the holding in *Cannon:*

> "* * * This opinion is troublesome, for it is common practice for the corporation's counsel to defend officers and directors in a derivative action, with the corporation being represented in the action by independent counsel. Such procedure seems proper, especially where the officers and directors have relied upon corporation counsel's advice, as the attorney should be allowed to defend his work and advice." ABA Professional Responsibility, A Guide for Attorneys: Shipman, *Professional Responsibilities of the Corporations Lawyer,* p 280 (1978).

We, on the other hand, are not troubled by the *Cannon* holding and reject this author's position for Oregon attorneys.

This statement of the Association of the Bar of New York City Committee on Ethics is illustrative:

> "The committee is divided in its views on whether it would in general be proper for a law firm to represent in a derivative stockholder's action both the corporate defendant on whose behalf the action has been brought and the individual defendants (officers, directors) who are alleged to have engaged in wrongdoing to the detriment of the corporation. Such representation, however, would be clearly improper in cases where the corporation may have to take an active part in action adverse to the director defendants." 196 NYC Bar 297 (Opinion No. 842, January 4, 1960).

■ We note that some commentators state that corporations should *always* be separately represented in a derivative action. *See, e.g.,* Henn, Corporations § 370 (2nd Ed 1970); Note, *Independent Representation for Corporate*

*Defendants in Derivative Suits,* 74 Yale L J 524 (1965).[8] It was well stated in *Garlen v. Green Mansions, Inc.,* 9 AD2d 760, 193 NYS2d 116, *reh den* 10 AD2d 557, 196 NYS2d 593 (1959):

> "While a corporation is usually a passive litigant in a stockholder's derivative action, it may well be that the equitable relief sought in the complaint requires an appearance and answer by the corporate defendant. However, such appearance must be by an independent counsel whose interests will not conflict with those of the individual defendant."

We recognize the dilemma created by a totally meritless action instituted by a minority shareholder. In the recent case of *Schwartz v. Guterman,* 109 NY Misc 1007, 441 NYS2d 597, 598 (1981), the court said:

> "* * * In a meritless * * * suit [retaining] separate counsel for the corporation * * * may delay the matter and cause a needless expense, ultimately borne by the shareholders * * *. Independent counsel may be unnecessary if the corporate * * * defendant is to be a nominal, passive party *without effect on the outcome* of the suit * * *.
>
> "On the other hand, if the action has merit, the expense of independent counsel may be justified. * * * If the corporation * * * assumes an active role in the litigation * * * separate counsel is advisable. * * *" (Emphasis added.)

We hold that counsel must withdraw unless the claim is patently sham or patently frivolous.[9]

At this point we distinguish our holding in *In Re Brownstein,* 288 Or 83, 87, 602 P2d 655 (1979), which was not a derivative stockholder's suit, in which we said:

---

[8] The accused relied upon the kind of reasoning found in G. Tockman, *The Position of Corporate Counsel in Derivative Actions,* 51 Ill Bar J 654 (1963), to support his position that it is proper for counsel to represent both the corporation and the controlling stockholders on the premise that their interests can never be divergent. He argues that since in every instance the acts of the controlling stockholders will be the acts of the corporation there can be no conflict. We specifically reject this position as it totally ignores the rights of the minority stockholders who may have significant derivative rights to assert on behalf of themselves and the corporation.

[9] *See, Andrysek v. Andrysek,* 280 Or 61, 69 n 8, 569 P2d 615 (1977):

> "* * * A frivolous plea is one which, although true in its allegations, is totally insufficient in substance. A sham plea is one good in form but false in fact; it is a pretense because it is not pleaded in good faith. *See, e.g.,* Black's Law Dictionary (Revised Fourth Edition) 1968."

"* * * Where a small, closely held corporation is involved, and in the absence of clear understanding with the corporate owners that the attorney represents solely the corporation and not their individual interests, it is improper for the attorney thereafter to represent a third party whose interests are adverse to those of the stock-holders and which arise out of a transaction which the attorney handled for the corporation. In actuality, the attorney in such a situation represents the corporate owners in their individual capacities as well as the corporation unless other arrangements are clearly made. *In re Banks, supra.* An attorney may not represent, nor appear to represent, a person in a transaction and then subsequently represent another who has an adverse interest arising therefrom. *In re Mumford/Thompson,* 285 Or 559, 591 P2d 1377 (1979).

"This court does not say that a lawyer cannot put together small transactions in which the amounts involved are not large enough to justify the expense required for each interested party to have individual representation. However, when such a transaction is handled, it should be with extreme caution and with a clear and explicit under-standing concerning whom the lawyer represents. In the absence of such an understanding, the attorney should represent no party to the transaction if thereafter a dispute arises among the parties relative to it. If, at the request of the parties, the lawyer represents all the parties to the transaction, he has the duty to explain to them the con-flicts of interest that exist between them."

As can be readily seen, *Brownstein* might allow representa-tion in "small transactions," where "the amounts involved are not large enough to justify the expense" of "individual representation" if handled with "extreme caution" at "the request of the parties" after the lawyer has undertaken to "explain to them the conflicts of interest" and "in the absence of such an understanding" the lawyer should repre-sent "no party."[10]

---

[10] The language in *Brownstein,* "In actuality, the attorney in such a situation represents the corporate owners in their individual capacities as well as the corporation unless other arrangements are clearly made. *In re Banks, supra,*" should not be misinterpreted. It refers to the special relationship in *Banks* where the controlling stockholder *was* the corporation. The appropriate rule for a corporation with minority stockholders with substantial interests such as Klinicki's 33 percent is:

"As a corporation speaks and acts only through its officers and directors, its counsel is their legal advisor in respect to its affairs, but in performing

This is simply not the case here. Here, the parties are clearly adverse, this is a major financial undertaking and the accused has admittedly taken up sides in the battle. Our holding in *Brownstein* is clearly not applicable to the facts of the case before us.

In the brief of the accused, counsel claims:

"Never has DR 5-105 been cited as the basis for precluding corporate counsel from representing the controlling stockholder-director individual defendants in a stockholder's derivative action, no matter how grievous the alleged transgressions against corporate interest."

Were this so, we would not necessarily be precluded from applying DR 5-105 to the instant case. Before us is a disciplinary case, not a derivative stockholder's action. This court has exclusive jurisdiction in disciplinary matters. However, we note that the *Cannon* court (cited by the accused) applied Canon 5 and Ethical Consideration 5-1 with a footnote to the Disciplinary Rules. (Set out above at 16.) Because *Cannon* was not a disciplinary case it is understandable why a direct application of DR 5-105 was unnecessary.

We point out that in *Clark v. Lomas & Nettleton Fin. Corp.,* 79 FRD 658 (1978), a direct and specific reference was made to DR 5-105 when the court discussed the role of counsel in a dispute between shareholders and corporate directors:

"Canon 5 of the Code of Professional Responsibility and the applicable *DR 5-105* prohibit representation of multiple clients with adverse interests. Code of Professional Responsibility Canon 5, DR 5-105. The principles set forth in the Canons and the rules apply to the possible disqualification of Both, Inc.'s present counsel, and are completely discussed in *Cannon v. U.S. Acoustics Corp.,* 398 F Supp 209 (ND Ill 1975)." (Emphasis added.) *Id.* at 660.

---

that duty he is acting as the corporation's attorney only and not as the attorney of any of its stockholders, directors, or officers as individuals, or any group or faction thereof." ABA Opinion 86 (1932).

which we adopted in *Banks* by saying:

"* * * The corporation usually is considered an entity and the attorney's duty of loyalty is to the corporation and stockholders." (Citations omitted.) 283 Or at 469.

The accused further claims that "[n]o court *sua sponte* has questioned the dual representation." We presume the trial court in the instant case was not meant to be included in this statement. Further, in 1973, the accused's firm represented corporate defendants in *Niedermeyer, et al. v. Niedermeyer, et al.,* CCH Fed Sec L Rep (1973 Transfer Binder) 94.123 (D Or 1973). In *Niedermeyer,* plaintiffs asserted that defendants, some as principals and others as aiders and abettors, were liable for an alleged fraudulent scheme[11] in connection with the sale of American Timber and Trading Co., Inc. stock. On trial, Federal District Court Judge Skopil denied plaintiffs any recovery. However, the court observed the evidence revealed some of the parties may have wasted corporate assets. He found a substantial conflict of interest between some plaintiffs and ATT. He announced, *sua sponte,* at 94.502:

> "During the trial, I inquired as to a conflict of interest between ATT and other plaintiffs. It now appears that there is a substantial conflict and that the interest of ATT may not have been properly represented. Therefore, I intend to appoint an independent attorney to represent the interest of ATT in this case."

*Niedermeyer* is often cited in conflict of interest cases as authority for disqualifying corporate counsel in stockholder derivative suits. *See, Messing v. FDI, Inc.,* 439 F Supp 776, n 6 (1977); *Clark v. Lomas & Nettleton Fin. Corp.,* 79 FRD 658, 660 (1978), and *Rosen v. LeMars Mut. Ins. Co. of Iowa,* 230 NW2d 905 (Iowa 1975).

On the Oregon State Bar's second charge we find the accused guilty of violating DR 5-105(B). In acting as corporate counsel to Berlinair, he owed allegiance to the corporate entity. *In re Banks,* 283 Or at 469. The accused was also representing and owed allegiance to the Lundgrens and their corporation, Lelco, Inc., in forming ABC and in advising them on its affairs, including whether or not pursuit of the Berlin Flug Ring contract might be a wrongful appropriation of a Berlinair corporate opportunity. As *Banks* points out, there is no conflict of interest in

---

[11] In *Niedermeyer,* insiders were purchasers of a majority stock interest and it was alleged that financial information furnished by the sellers was false and misleading. The purchasers were an officer/director, his wife and an undisclosed principal who was represented by the officer. The purchasers were chargeable with knowledge of the true net worth by virtue of their positions as insiders.

representing both a corporation and its controlling share-holders so long as their interests do not diverge, but an attorney formerly representing both interests can represent neither when the interests diverge and become antagonistic. *Id.* at 475. Devotion of full allegiance to both the Lundgrens and their corporation, Lelco, on the one hand, and Berlinair, on the other, was impossible.

## The Third Charge

The third charge is that the accused violated DR 5-102(A) by representing Berlinair, ABC and Kim Lundgren in Klinicki's stockholder derivative suit when it was allegedly obvious that the accused ought to have been called as a witness on behalf of his clients.

DR 5-102(A) provides:

"If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5-105(B)(1) through (4)."

The trial board and the Disciplinary Review Board found the accused not guilty of this charge. The trial board found:

"While the Accused could have been called as a witness in the lawsuit by either side, neither side chose to do so. The Accused was informed well before the trial that the plaintiff's attorneys did not intend to call him as a witness. The Accused testified that he gave the Lundgrens the option of determining that the Accused be called as a witness and his firm disqualified as trial counsel for the defendants in the litigation, or of not calling the Accused as a witness, with his firm continuing as counsel for the defendants. The Accused testified that the Lundgrens opted for the latter.

"Whether or not the Accused should have been called as a witness on behalf of any of the defendants he represented is a question upon which experienced trial lawyers could differ, under the circumstances of this case. While the Accused's participation in the affairs at issue subjected him and his law firm to the appearance of being put on

trial by the plaintiff's case, the same could have happened whether or not the Accused testified as a witness. There does not appear to be any matter of substance on which the Accused's tetimony would have been the only evidence available in the litigation.

"The trial board concludes that the Accused has not violated DR 5-102(B) [*sic:* (A)] as charged by the Complaint of the Bar."

We disagree and find the accused guilty of charge three.

Of all the actions that the accused took in this case, to the possible detriment of his clients, the most tangible and serious deviation involved the loss of his testimony to either protect his client, Kim Lundgren, against a potential liability to Klinicki, or in the alternative to help the corporation against Kim Lundgren for depriving the corporation of a valuable corporate opportunity. What the accused did was to attempt to neutralize himself so that he would not be called at all. This left vital testimony by Klinicki unrebutted. Klinicki testified that the accused assured him of a pro-rata participation in any new corporate opportunity and further testified to the court and the jury, "If you can't trust your lawyer, who can you trust?". Judge Van Hoomissen commented that he felt that this testimony by Klinicki would have a devastating effect upon defendant Lundgren and that the jury would be blaming Lundgren for the conduct of his lawyer. Plaintiff's willingness to stipulate that this testimony should go unrebutted is understandable.

We find it was obvious to the accused that he "ought to be called as a witness on behalf of his client" as provided by DR 5-102(A) to rebut Klinicki's testimony. Although the accused had his partner, Mr. Franzke, conduct the interrogation of witnesses and argue the case, he still appeared in this case as trial counsel. We held in the case of *In re Lathen*, 294 Or 157, 654 P2d 1110 (1982), that DR 5-102(A) requires that it be proven that the accused actually learned or that it was obvious to the accused that he or his partner ought to be called in the trial of a client. The accused must have known from the filing of the original complaint by Klinicki against Lundgren that the key testimony about the corporate opportunity would

involve the discussion that took place in West Berlin at the Journalist Club.

The accused clearly rebutted Klinicki's testimony at his disciplinary hearing:

"THE CHAIRMAN: Now let's be sure about that, he says that you — at least I gather, Mr. Klinicki's testimony was that you told him he would have preemptive rights if any corporation was formed, and you dispute that, is that right?

"THE WITNESS: Yes, because that is not so. I don't think I would give a bomb [*sic:* bum] opinion, a bomb [*sic:* bum] statement of the law that is — that is that wrong. I did not know it was wrong at the time, but I did not know that it was right, because I know after the litigation I had one of the fellows in our firm check out how about maybe preemptive rights solves this question, and is not dependent on the corporate opportunity doctrine.

"THE CHAIRMAN: Was there any discussion at this meeting of the corporate opportunity doctrine?

"THE WITNESS: No. I did not really relate this up — I did not relate this situation of the corporate opportunity doctrine until we got the Complaint."

The trial jury and court were deprived of this key testimony.

The accused admitted meeting with Oregonian newspaper reporter David Whitney on April 6, 1980, in his testimony before the trial board. He was asked whether he admitted to Mr. Whitney that "his only mistake, if he committed any, was not to have been a witness in the case. Maybe I should have bowed out so that I could appear as a witness, but the Lundgrens would have no part of that." In response to the Bar's counsel's question, "Do you recall making that statement to that effect to Mr. Whitney?", the accused answered "Yes."

In addition to that admission, we have already quoted at length the admonition of the trial judge and the warning that Klinicki's testimony was extremely damaging plus the trial judge's clear inference that the trial should be discontinued because of the obvious conflict of interest.

It is for these reasons that we find the accused had actual knowledge that he ought to be called as a witness.[12]

We conclude that the accused violated DR 5-102(A) as charged by the complaint of the Bar.

The purpose of this decision is to admonish the accused, to provide guidance to the members of the Bar and to protect the interests of society. The accused violated the Disciplinary Rules as set forth. We impose the sanction of a public reprimand.[13]

Accused reprimanded. The Oregon State Bar is awarded its actual and necessary costs and disbursements. ORS 9.536(4).

---

[12] A basic rule of legal ethics provides that an advocate cannot be a witness in the same case. As stated in *Rice v. Baron,* 456 F Supp 1361, 1369 (1978):

"* * * [A lawyer] must be disqualified from further representing all of its present clients in this action under the so-called 'advocate-witness rule' which 'bars an attorney from acting as trial counsel in a case in which he or a member of his firm will be a material witness.' Note, *The Advocate-Witness Rule: If Z, then X. But Why?,* 52 N.Y.U.L.Rev. 1365, 1366-67 (1977) (footnote omitted) * * *. D.R. 5-102 * * * requires that a lawyer discontinue his representation of a client when the 'lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client' and 'it is apparent that his testimony *is or may be prejudicial to his client.'* D.R. 5-102(B) (emphasis added) (footnote omitted)."

ORE 606-1 now renders a lawyer incompetent to testify in a case in which he appears as counsel unless he falls within designated exemptions:

"An attorney representing a party litigant at trial shall not offer to be a witness or offer a member of the attorney's firm as a witness at the trial unless:

(1) The testimony of the attorney or member will relate solely to an uncontested matter;

(2) The testimony of the attorney or member will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony;

(3) The testimony of the attorney or member will relate solely to the nature and value of legal services rendered in the case by the lawyer or the lawyer's firm to the client;

(4) As to any matter, refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or the lawyer's firm as counsel in the particular case; or

(5) The court finds that the interests of justice require the testimony."

[13] We find that a public reprimand is appropriate in this case. We are limiting the sanction because the accused's conduct preceded our decision in *In re Banks, supra;* otherwise a sanction of a more severe nature would be in order.