**Sundar V. NILAVAR, M.D., Plaintiff,**

v.

**MERCY HEALTH SYSTEM– WESTERN OHIO, et al., Defendants.**

**No. C–3–99–612.**

United States District Court, S.D. Ohio, Western Division.

Feb. 20, 2001.

Lee C. Falke, Dayton, OH, Kenneth A. Lazarus, Washington, DC, for plaintiff.

Scott D. Phillips, Cincinnati, OH, John K. Cogan, Columbus, OH, Thomas Demitrack, cleveland, OH, for defendants.

DECISION AND ENTRY OVERRULING PLAINTIFF'S MOTION TO DISQUALIFY FROST & JACOBS AS COUNSEL FOR DEFENDANTS MERCY HEALTH SYSTEM WESTERN OHIO, CATHOLIC HEALTHCARE PARTNERS, MICHAEL PETERSON, AND JEROLD MAKI (DOC. # 25).

RICE, Chief Judge

The instant litigation arises out of an exclusive contract between Defendant Diagnostic Imaging Associates ("DIA") and Mercy Health Systems–Western Ohio ("MHS–WO"), whereby only DIA would provide radiology services for hospitals and other facilities owned by MHS–WO. Defendants MHS–WO, Catholic Healthcare Partners ("CHP"), Michael Peterson ("Peterson"), and Jerold Maki ("Maki") are represented in this litigation by the firm of Frost & Jacobs. Pending before the Court is Plaintiff's Motion to Disqualify that law firm as counsel for those Defendants (Doc. # 25). For the reasons as-

signed, Plaintiff's Motion is OVER-RULED.

## I. *Factual Background*

Between 1970 and 1995, Springfield Radiology, Inc. ("SRI"), provided physician diagnostic radiology services at the three hospitals and related facilities in the area centered around Springfield and Urbana, Ohio: Mercy Medical Center of Springfield, Ohio, and Mercy Memorial Hospital of Urbana, Ohio (collectively, the "Mercy Hospitals"); and Springfield Community Hospital. MHS–WO owns and operates the Mercy Hospitals, in addition to several long-term and urgent care facilities in the Springfield Urbana area. In 1991, SRI was comprised of eleven principals.[1]

In 1980, Dr. Stanley Nedelman, then President of SRI, retained attorney Thomas Mehnert ("Mehnert"), a partner at Frost & Jacobs, as legal counsel for the corporation (Mehnert Aff. ¶ 4). Dr. Nedelman was Mehnert's primary contact at SRI, and Menhert represented SRI on various matters referred to him by Dr. Nedelman and other SRI officers. At the time that Mehnert began providing legal services for SRI, Frost & Jacobs also represented MHS–WO (formerly called Mercy Medical Center of Springfield, Ohio). According to Mehnert, he immediately made Dr. Nedelman and the other SRI officers aware of the firm's representation of MHS–WO (*id.* ¶ 6). Plaintiff did not become aware that Frost & Jacobs also represented MHS–WO until sometime after the dissolution of SRI in 1995 (Nilavar Aff. ¶ 7). Throughout Frost & Jacob's attorney-client relationship with SRI, Mehnert had discussions with Plaintiff and other SRI principals. According to Plaintiff, he "counseled them in confidence and was involved in SRI meetings and discussions relevant to the confidential plans and intentions of SRI principals for dealing with the Mercy Hospitals in 1995." (*Id.* at 6)

In 1993, SRI engaged in extensive negotiations with MHS–WO toward an exclusive contract for the provision of radiological services at the Mercy Hospitals and several other MHS–WO long-term care facilities (V.Compl.¶ 34). According to Mehnert, due to his firm's representation of MHS–WO, he notified SRI management that it should obtain separate legal counsel for legal advice that may relate to SRI's proposed contracts and relationship with MHS–WO. (Mehnert Aff. ¶ 12). In 1994, SRI engaged attorney Lloyd DePew to represent it in its negotiations with MHS–WO concerning an exclusive radiology services contract (DePew Aff. ¶ 3). Plaintiff maintains that Mehnert was privy to SRI's plans and intentions with regard to the Mercy Hospitals in 1995.

On March 22, 1995, MHS–WO decided to conclude its negotiations with SRI, and to prepare a Request for Proposal ("RFP") for a contract of exclusive radiology services to interested radiologists and radiology groups (V.Compl.¶ 37). The physician-shareholders of SRI decided that the Mercy group would present a proposal to MHS–WO in response to the RFP (*id.* ¶ 39). Without informing Plaintiff, Dr. Robin Osborn ("Osborn"), a physician-shareholder of SRI, formed his own radiology group, DIA, and submitted a proposal to MHS–WO on its behalf (*id.* ¶ 40). DIA included only three physicians from SRI's Mercy group; Dr. Nilavar was not includ-

---

1. Dr. Nilavar, the Plaintiff, was hired by SRI in 1976, and he became a shareholder in 1979. The Court has found no indication in the record to date that Plaintiff was an officer of the corporation. In 1991, five SRI radiologists practiced almost exclusively at Springfield Community Hospital ("Springfield Group"), while the other six radiologists practiced almost exclusively at the Mercy hospitals ("Mercy Group").

ed in the new entity (*id.* ¶ 41). In August of 1995, MHS–WO accepted DIA's proposal (*id.* ¶ 42). An exclusive Radiology Services Agreement was signed on December 4, 1995, effective January 1, 1996 (*id.*).

Since July 31, 1996, Mehnert has not been employed by or a partner of Frost & Jacobs. He has been employed as in-house counsel with Cincinnati-based corporations, which are unrelated to this litigation (Mehnert Aff. ¶ 3). None of the Frost & Jacobs attorneys who are involved in this litigation were involved in Frost & Jacobs' representation of SRI (*id.* ¶ 5).

## II. *Plaintiff's Motion to Disqualify (Doc. # 25)*

■ The power to disqualify an attorney from a case is "incidental to all courts, and is necessary for the preservation of decorum, and for the respectability of the profession." *Ex Parte Burr,* 22 U.S. (9 Wheat.) 529, 531, 6 L.Ed. 152 (1824)(Marshall, C.J.); *Kitchen v. Aristech Chem.,* 769 F.Supp. 254, 256 (S.D.Ohio 1991)(Weber, J.). However, "the ability to deny one's opponent the services of his chosen counsel is a potent weapon." *Manning v. Waring, Cox, James, Sklar & Allen,* 849 F.2d 222, 224 (6th Cir.1988); *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 722 (7th Cir.1982)(motions for disqualification should be viewed with extreme caution, because they can be used as techniques of harassment). Thus, when confronted with a motion to disqualify, the Court must be "sensitive to the competing public interests of requiring professional conduct by an attorney and of permitting a party to retain counsel of his choice." *Kitchen,* 769 F.Supp. at 257; *Hamrick v. Union Township, Ohio,* 79 F.Supp.2d 871, 874 (S.D.Ohio 1999) (Spiegel, J.). Because litigants often make such motions for tactical reasons, and because disqualification of counsel impinges on a party's right to employ the counsel of its choice, the moving party bears the burden of establishing the need for disqualification. *E.g., Correspondent Servs. Corp. v. J.V.W. Investment Ltd.,* 2000 WL 1174980, *10–11 (S.D.N.Y. Aug.18, 2000).

■ The Sixth Circuit has established a three-part test for determining whether grounds for disqualification exist. *Dana Corp. v. Blue Cross & Blue Shield Mutual of Northern Ohio,* 900 F.2d 882, 889 (6th Cir.1990). *First,* a prior attorney-client relationship must have existed between the party seeking disqualification and the attorney it seeks to disqualify. *Second,* the subject matter of the alleged prior and the present relationship must be substantially related. *Third,* the attorney must have acquired confidential information from the party seeking disqualification. *Id.* Because the Court concludes that no attorney-client relationship ever existed between Frost & Jacobs and Plaintiff, the Court need only address the first prong of the *Dana* test.

### A. *Past Attorney–Client Relationship*

■ The first part of the *Dana* test requires Plaintiff to establish that Mehnert had established an attorney-client relationship with him. This relationship may be consensual and contractual, or it may be implied. *Hamrick,* 79 F.Supp.2d at 874. The test of whether an attorney-client relationship had been created is essentially "whether the putative client reasonably believed that the relationship existed and that the attorney would therefore advance the interests of the putative client." *Id.* at 875 (quoting *Henry Filters, Inc. v. Peabody Barnes, Inc.,* 82 Ohio App.3d 255, 261, 611 N.E.2d 873, 876 (1992)); *Thompson v. Karr,* 1999 WL 519297 (6th Cir. July 15, 1999)(same). An "essential element as to whether an attorney-client relationship has been formed is the determination that

the relationship invoked such trust and confidence in the attorney that the communication became privileged and, thus, the information exchanged was so confidential as to invoke an attorney-client privilege." *Thompson, supra* (quoting *Landis v. Hunt,* 80 Ohio App.3d 662, 669, 610 N.E.2d 554, 558 (1992)). In the instant case, Plaintiff has not argued that, nor has he provided evidence of, a contractual or consensual attorney-client relationship between himself and Frost & Jacobs. Thus, Plaintiff must rely on the existence of an implied attorney-client relationship. To establish such a relationship, Plaintiff must show (1) that he submitted confidential information to Mehnert during the time that Frost & Jacobs represented SRI, and (2) that he did so with the reasonable belief that Mehnert was acting as his personal attorney. *Pain Prevention Lab. v. Electronic Waveform Labs,* 657 F.Supp. 1486, 1495 (N.D.Ill.1987).

■ In general, an attorney's representation of a corporation does not make that attorney counsel to the corporate officers and directors as individuals. *E.g., Quintel Corp., N.V. v. Citibank, N.A.,* 589 F.Supp. 1235, 1240 (S.D.N.Y.1984). As recognized by Plaintiff, the mere exchange of a confidential communication between counsel for an organization and the organization's officers or agents about a matter of interest to the organization does not, by itself, create an attorney-client relationship between counsel and the officer or agent with respect to that person's own interests in the same matter.

Plaintiff asserts that he reasonably believed that Frost & Jacobs represented his personal interests, consistent with the interests of SRI. He indicates that he shared with Mr. Mehnert all of the implications of his disagreements with the Mercy Hospitals, including the issues of the use of ionic contrast materials and his discomfort with

the provision of exclusive radiology services by any physician group. (Nilavar Aff. ¶ 7, Ex. A). Plaintiff further states that Mehnert "counseled [him] and other members of SRI in confidence and was involved in SRI meetings and discussions relevant to confidential plans and intentions of SRI principals for dealing with the Mercy Hospitals in 1995." (*Id.* ¶ 6) In addition, Nilavar states that Mehnert never gave any indication to Plaintiff that they did not have an unrestricted attorney-client relationship (*id.* ¶ 7).

In support of his argument that Mehnert represented him individually, Plaintiff cites to *Rosman v. Shapiro,* 653 F.Supp. 1441 (S.D.N.Y.1987). In that case, the lawsuit was brought by one co-owner of a close corporation (Rosman) against the other co-owner (Shapiro) and a filtration products distributor. Rosman moved for disqualification of Shapiro's counsel, who was also counsel for the corporation. The court granted the motion, finding that the law firm had represented both the corporation and its corporate officers. This finding was based on the facts that Rosman had had several meetings with counsel, during which they extensively discussed the legal and factual issues which subsequently became the subject of the dispute, and that the corporation was a close corporation consisting of two shareholders, each of whom held 50% of the corporation's shares. *Id.* at 1444–45. Based thereon, the court concluded that, at the time that the prior communications took place, Rosman could have reasonably believed that the law firm had represented him personally.

Other courts have limited *Rosman's* holding. In *Correspondent Servs., supra,* the court rejected defendant Kelleher's argument that counsel for a close corporation had an attorney-client relationship with him individually. The court distin-

guished *Rosman,* noting that a 20% beneficial interest in a close corporation "is a far cry from the 50–50 ownership stake in *Rosman."* 2000 WL 1174980 *13. It further noted that although Kelleher had asserted in an affidavit that the law firm was retained "to act as the attorneys for JVW, Waggoner, and myself", this statement was not supported by any of the documents submitted in connection with these motions. The court, therefore, concluded that no attorney-client relationship had been created between Kelleher individually and the law firm. *See also April Broadcasting, Inc. v. Smith,* 1996 WL 137487 (S.D.N.Y. Mar.27, 1996)(principal of close corporation did not establish personal attorney-client relationship with corporate counsel).

■ The fact that SRI was a close corporation does not lead to the conclusion that Plaintiff reasonably believed that he personally had an unrestricted attorney-client relationship with Mehnert. Between 1970 and 1983, SRI consisted of six physician-shareholders (V.Compl.¶ 23). When Dr. Bavendam retired in 1983, the corporation was restructured, with the five remaining principals receiving equal shares in the corporation (*id.* at 28). At the time, accordingly, Plaintiff would have had a twenty percent (20%) interest in the corporation. By 1991, SRI had approximately eleven principals (*id.* at 29). Thus, assuming that each principal had an equal interest in the corporation, Plaintiff held approximately a nine percent (9%) interest in SRI at that time. As stated by the *Correspondent Servs.* court, even twenty percent is "a far cry from the 50–50 ownership stake in *Rosman."* Therefore, the degree to which Plaintiff shared an ownership interest in SRI does not provide a strong basis for the conclusion that Plaintiff believed, at the time that he communicated with SRI's corporate counsel, that he was

communicating with Mehnert as his personal attorney.

Plaintiff further relies on *In re Berger McGill, Inc.,* 242 B.R. 413 (Bankr. S.D.Ohio 1999), to support his position that, as a principal in a close corporation, Mehnert's failure to inform him of the need to obtain separate counsel leads to the conclusion that Mehnert was also his personal counsel. In that case, the debtor, a close corporation, entered into a series of transactions in 1996 with its controlling shareholder, by which the shareholder loaned the company a substantial sum of money for working capital, entered into a stock purchase agreement, financed the debtor's redemption of his stock, entered into a guaranty fee agreement, and obtained a mortgage as security for the loans that he extended to the company. All the documentation regarding the transactions was prepared by counsel for the corporation, Lindhorst & Dreidame ("L & D"). The company paid for all of the legal services. Later, after filing for bankruptcy, the debtor company, through the bankruptcy trustee, initiated an adversary proceeding against the shareholder. The shareholder sought to disqualify L & D as counsel for the trustee, claiming that he had a prior attorney-client relationship with the firm. The bankruptcy court agreed with the shareholder as to the 1996 transactions. It reasoned that L & D had not advised the shareholder that it represented only the corporation and that he should retain separate counsel. It further stated that there was nothing in the record to indicate that the shareholder's interests differed from the corporation at that time. Thus, the court concluded that the shareholder could have reasonably believed that he had entered into a confidential relationship with L & D regarding his representation in the 1996 transactions. 242 B.R. at 421–22.

Plaintiff has not presented evidence to indicate that his situation is analogous. Although Plaintiff has stated in his affidavit that he was not informed by Mehnert that Frost & Jacobs was representing SRI alone, even when his and SRI's interests were aligned and, therefore, that Plaintiff should retain separate counsel to protect his interests, Plaintiff has not indicated that he entered into individual transactions or agreements with SRI, which would have warranted consultation with separate counsel. Plaintiff has not stated that he would have engaged separate counsel with regard to certain transactions, but for his belief that Mehnert and Frost & Jacobs were acting for his benefit, as well as for the benefit of SRI. In addition, the shareholder in *In re Berger McGill* was the controlling shareholder, making his situation closer to the 50–50 ownership interest presented in *Rosman.* More importantly, Plaintiff has *not* stated in his affidavit that he reasonably believed that Mr. Mehnert and Frost & Jacobs represented him *individually,* in addition to SRI, thus creating an attorney-client relationship between Frost & Jacobs and Plaintiff. In short, Plaintiff has not indicated, in any respect, that he believed that Mehnert and Frost & Jacobs implied that they were provided legal services for him personally, as well as for SRI, with regard to any transaction between himself and SRI. Accordingly, Plaintiff has not presented evidence to support the conclusion that Mehnert's failure to inform Plaintiff that he and Frost & Jacobs were acting solely for SRI led Plaintiff reasonably to believe that Mehnert had acted as his personal counsel.

Although Plaintiff states in his affidavit that he was never given any indication that he and Mehnert "did not have an unrestricted attorney-client relationship", the documents submitted in support of his Motion contradict his argument that he subjectively believed that Mehnert represent-

ed him individually. Plaintiff's Exhibit A (correspondence from Plaintiff to Mr. Mehnert) refers to Mr. Mehnert as "SRI atty." Plaintiff also attaches correspondence from Mehnert to him, dated October 5, 1995, which responds to his (Plaintiff's) September 29th letter, indicating that recent events at SRI had caused him to be unable to work (Pl.'s Ex. E). Although the October 5, 1995, letter sets forth the courses of action that Nilavar may take, it is clearly written as SRI's attorney, not as Plaintiff's personal counsel. Accordingly, the October 5th correspondence is not evidence of an attorney-client relationship. Most notably, Plaintiff sets forth his understanding of Mehnert's role in his correspondence, dated June 21, 1998 (Pl.'s Ex. G). Therein, he states, in pertinent part:

> ... You (Frost & Jacobs) have been *legal counsel to Springfield Radiologists, Inc. ("SRI"),* since I joined SRI in July 1976 ... You were involved in *all* aspects of legal transaction involving SRI and its Shareholder[s] and Employees. You have given oral and written advice/notice to me and other shareholders of SRI, including its president Dr. Stanley Nedelman, during this period. You were deeply involved in drafting and finalizing the Employee Contract, Shareholder Agreement[,] and [sic] among other corporate documents. Billing Invoices and payments to Frost and Jacobs will prove this.
>
> Secretary Ms. Judy Crable sent minutes of all the regular and special meetings of SRI to you. Corporate officers[,] especially SRI President Dr. Nedelman[,] was apparently in constant touch with you in times of crisis[,] including early and mid 1995. Your advice was often quoted in corporate meetings ...

(emphasis in original). Plaintiff plainly states that he recognized that Mr. Mehnert was *corporate* counsel, who was heavi-

**916**

ly involved in SRI's corporate affairs. The correspondence does not indicate that Plaintiff believed Mehnert acted as his personal counsel also.

In his Motion, Plaintiff also asserts that he discussed with Mehnert certain issues of "personal importance to him." However, these items of "personal importance" appear to be issues that arose as a shareholder in the corporation, not as an individual.[2] *See Cole v. Ruidoso Municipal Schs.*, 43 F.3d 1373, 1384 (10th Cir.1994)(principal did not have a personal attorney-client relationship with corporate counsel, even though she consulted with its attorneys on "sensitive personnel issues" and acted on their advice; the belief that she had a personal attorney-client relationship was not reasonable, because she consulted the law firm only for the purpose of carrying out her duties as a principal). Moreover, these items, which Plaintiff asserts he discussed with Mehnert in confidence, do not appear to be confidences, within the meaning of DR 4–101(A).[3] Plaintiff alleges in his Verified Complaint that his relationship with MHS–WO was strained for a number of years, because of an ongoing dispute that he had with Mr. Peterson and other MHS–WO administrators regarding the use of ionic contrast material (V.Compl.¶ 31). In addition, the evidence indicates that issues identified by Plaintiff were corporate issues, which were

discussed by the principals in the corporation. For example, Plaintiff's Exhibit A (memorandum from Dr. Osborn to Radiologists and Dr. Kalweit), which reflects Plaintiff's views on the use of ionic contract material, was sent by Dr. Osborn and was to be returned to that Defendant. Plaintiff's views regarding the use of ionic contrast materials were sent to all radiologists, to Mr. Himes, Vice President of Mercy Medical Center, as well as to Mr. Mehnert. Furthermore, Plaintiff has stated in his affidavit that he communicated his views to Mr. Mehnert both directly and indirectly, *i.e.*, through staff and colleagues. Based thereon, Plaintiff has not shown that his communications with Mr. Mehnert were confidential and that he (Plaintiff) did not also communicate those views to the corporation. *See Wayland v. Shore Lobster & Shrimp Corp.*, 537 F.Supp. 1220, 1223 (S.D.N.Y.1982)("[I]t is clear that the firm was representing the corporation and thus Wayland could not have reasonably believed or expected that any information given to the firm would be kept confidential from the other shareholders or from the corporation as an entity."); *Hoban v. Strata Mktg., Inc.*, 1991 WL 204965 (N.D.Ill. Oct.2, 1991) ("There is no evidence whatsoever that Hoban privately discussed with [attorney] Gordon confidential matters that he expected would not be revealed to any of the defendants."). In

**2.** Although the party moving for disqualification need not reveal the substance of its communication to the lawyer, in order to protect client confidentiality, *Cole*, 43 F.3d at 1384 n. 8, Plaintiff has not even suggested that he communicated with Mehnert about issues other than those related to his position as a principal of SRI.

**3.** DR 4–101 provides, in pertinent part:
(A) "Confidence" refers to information protected by the attorney-client privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be

held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.
(B) Except when permitted under DR 4–101(C), a lawyer shall not knowingly:
(1) Reveal a confidence or secret of his client.
(2) Use a confidence or secret of his client to the disadvantage of the client.
(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

addition, Plaintiff has provided no evidence that: 1) either Mr. Mehnert or Frost & Jacobs provided personal legal services to him, unconnected with the corporation; 2) either Mr. Mehnert or Frost & Jacobs provided specific services for SRI principals, in addition to the corporation, *see Alex Munoz General Contractor v. MC3d, Inc.,* 1998 WL 831806 (N.D.Ill. Nov.25, 1998)(counsel for joint venture had attorney-client relationship with each joint venturer and shareholder, when firm responded to subpoenas for each joint venturer and shareholder as well as for the close corporation and the joint venture); or 3) that he paid for any legal services by Frost & Jacobs, *compare Burda Media, Inc. v. Blumenberg,* 1999 WL 1021104 at *3 (S.D.N.Y. Nov.8, 1999) (former client paid attorney legal fees of $20,000 for effort to settle action). In essence, Plaintiff has not provided evidence that he reasonably believed that Mr. Mehnert and Frost & Jacobs represented him *individually,* in addition to SRI, thus creating an attorney-client relationship between Frost & Jacobs and himself. Rather, Plaintiff's evidence indicates that he believed that his communications with Mr. Mehnert were confidential vis-a-vis MHS–WO, but not vis-a-vis SRI and its principals. Therefore, Plaintiff has not established that he personally had an attorney-client relationship with Mr. Mehnert or Frost & Jacobs.[4] Accordingly, Plaintiff's Motion to Disqualify Frost & Jacobs is OVERRULED.[5]

**B.   Attorney as Witness**

Plaintiff further argues that Frost & Jacobs should be disqualified, because Mr. Mehnert will be called as a witness in this litigation. Plaintiff asserts, citing Ohio Code of Professional Responsibility DR 5–101(B),[6] that Mr. Mehnert "will likely be called to testify one way or the other, in derogation of the interests of either his present or former client." (Doc. # 25 at 16). However, Plaintiff does not indicate as to what Mr. Mehnert is likely to testify, and whether he alone can provide that information. Plaintiff has sworn in his Verified Complaint that he had disagreements with Mr. Peterson and MHS–WO regarding the use of non-ionic contrast materials. He has further stated in his affidavit that he was uneasy with the use of exclusive radiology contracts. The Court sees no reason why Plaintiff cannot

---

**4.**   Because Plaintiff's affidavit and supporting documentation, even when construed in his favor, do not indicate that he reasonably believed that Mr. Mehnert and Frost & Jacobs represented him individually, in addition to SRI, the Court concludes that an evidentiary hearing is unnecessary, there being no issues of fact to resolve. *See General Mill Supply Co. v. SCA Servs., Inc.,* 697 F.2d 704 (6th Cir.1982).

**5.**   Because the Court has concluded that no attorney-client relationship existed between Plaintiff and Frost & Jacobs, the Court need not address whether this action is substantially related to the alleged prior representation or whether Frost & Jacobs acquired confidential information from Plaintiff.

**6.**   DR 5–101(B) provides:
A lawyer shall not accept employment in contemplated or pending litigation if the lawyer knows or it is obvious that the lawyer or a lawyer in the firm ought to be called as a witness, except that the lawyer may undertake the employment and the lawyer or a lawyer in the firm may testify:
(1) If the testimony will relate solely to an uncontested matter.
(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.
(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or the firm to the client.
(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or the firm as counsel in the particular case.

testify to such matters, rather than having Mr. Mehnert do so. Plaintiff has not suggested any other information which Mr. Mehnert might possess which would require him, as opposed to some other witness, to testify in this litigation. Although Defendants do not explicitly state they would not call Mr. Mehnert as a witness, they state that "matters related to Frost & Jacobs' corporate representation of SRI would likely be irrelevant to these proceedings." (Doc. # 27 at 12). Moreover, Mr. Mehnert has sworn that he played no role in the formation of DIA, Plaintiff's exclusion from that corporation, or DIA's negotiations and contract formation with MHS–WO (Mehnert Aff. ¶ 14). Thus, it appears unlikely that Mr. Mehnert would be called as a witness for Defendants. In addition, the fact that Mr. Mehnert is no longer associated with Frost & Jacobs weighs against a determination that Frost & Jacobs must be disqualified if Mr. Mehnert were to testify. Accordingly, Plaintiff has not provided any evidence that Mr. Mehnert ought to be called as a witness in this litigation, that Mr. Mehnert knows that he will be a witness, or that Ohio Code of Professional Responsibility DR 5–101 requires the disqualification of Frost & Jacobs. Accordingly, Plaintiff's Motion to Disqualify Frost & Jacobs, on the ground that Mr. Mehnert may be a witness in this litigation, is OVERRULED.

For the foregoing reasons, Plaintiff's Motion to Disqualify Frost & Jacobs as Counsel for Defendants Mercy Health System Western Ohio, Catholic Healthcare Partners, Michael Peterson and Jerold Maki (Doc. # 25) is OVERRULED.